**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| ELLA LANE<br>2400 3rd Street NE<br>Washington, D.C. 20002,<br><br>ADRIAN CROSSLAND<br>2400 3rd Street NE<br>Washington, D.C. 20002,<br><br>TERRENCE CROSSLAND<br>2400 3rd Street NE<br>Washington, DC 20002,<br><br>       Plaintiffs.<br><br>v.<br><br>THE DISTRICT OF COLUMBIA<br>1350 Pennsylvania Avenue NW<br>Washington, D.C. 20004,<br><br>Officer John Wright<br>Metropolitan Police Department<br>(Badge No. 2907),<br><br>John Doe Officers 1–10,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No.  1:14-cv-1316<br><br>Jury Trial Demanded |

## <u>COMPLAINT</u>

1.    On October 27, 2012, officers from the Metropolitan Police Department ("MPD") held 71-year-old Ella Ann Lane outside of her home for more than six hours.  The officers did not allow Ms. Lane, who had been watching television alone when they arrived, to re-enter her own home.  The elderly Ms. Lane was unable to eat, get water, or use her bathroom until her daughter returned from work, at which time Ms. Lane was able to go to McDonald's to use the public restroom.

2.      Ms. Lane, a retired grandmother, was not suspected of any wrongdoing, nor did the officers have any facts or evidence that any illegal activity had ever occurred in her home.

3.      Instead, the officers sought to enter her home and to look through all of her most intimate possessions because they had found a firearm in a jacket belonging to an acquaintance of Ms. Lane's grandson as that man—whom Ms. Lane had never met—was sitting on the sidewalk steps below Ms. Lane's yard and outside her fence.  Based on their "training" and "experience" concerning the habits of "persons involved in illegal activities," MPD officers asserted in a search warrant application that they believed they would find evidence of criminal activity in Ms. Lane's home.

4.      When MPD officers finally obtained a warrant to search the home, they omitted from the sworn warrant application presented to the Superior Court judge that two police officers had already illegally entered and searched Ms. Lane's home without a warrant and found nothing unlawful.

5.      Nothing illegal was ever found in the home.

6.      Nonetheless, as detailed below, Ms. Lane was physically abused and verbally threatened by the MPD officers, including one MPD officer who, after finding nothing illegal, told Ms. Lane that, if he was ever called back to her house, he would make sure that she lost her home.  Ms. Lane had lived in the home for over 37 years.

7.      Before MPD officers finally left her home that night, the officers deleted the photographic evidence that Ms. Lane had taken of the officers' pre-warrant illegal intrusion onto her property from her digital camera.

8.      The egregious and unlawful actions of the local government agents in this case have become a frightening reality for many impoverished families of color in the District.  What

happened to Ms. Lane and her family raises serious questions about the systemic misconduct and recklessness of the Metropolitan Police Department and its agents in obtaining search warrants and executing home raids in the District of Columbia.[1]

## Nature of the Action

9.      The Plaintiffs seek compensatory relief for the violations of their constitutional rights against the District of Columbia and the Defendant Officers in their individual capacities.

## Jurisdiction and Venue

10.      This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourth and Fifth Amendments to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

11.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## Parties

12.      Plaintiff  Ella Ann Lane is a 72-year-old resident of the District of Columbia. Plaintiff Adrian Crossland is a 53-year-old resident of the District of Columbia.  She is Ms. Lane's daughter.  Plaintiff Terrence Crossfield is a 28-year-old resident of the District of Columbia. He is Ms. Lane's grandson.

13.      Defendant the District of Columbia is the municipal entity that operates the Metropolitan Police Department and that trains and supervises the Defendant officers.

14.      Defendant Officer John Wright prepared and swore under oath the search warrant application and participated in the planning and execution of the home search.  He also initiated and participated in the unlawful stop, search, and arrest of Terrence Crossland on which the

---

[1] The allegations in this Complaint are based on personal knowledge as to matters in which the Plaintiffs have had personal involvement and information and belief as to all other matters.

home search warrant was ostensibly predicated and entered and searched Ms. Lane's home without a warrant prior to obtaining a search warrant.

15.     John Doe Officers 1–10 are the Metropolitan Police Department officers who participated in the planning and execution of the home search, who participated in the unlawful stop, search, and seizure of Mr. Crossland, the unlawful seizure of Ms. Lane, the unlawful seizure of Ms. Crossland, and the unlawful warrantless home search.  On information and belief, their last names include Haselden, King, Skaluba, Boykins, Yates, Peterson, Paul, and Hoffman. Defendants Wright and the District of Columbia are in possession of the full names and badge numbers of Defendant John Doe Officers, and their full identities can be easily discovered.

## Factual Background

### The Events As Described in the Warrant Application

16.     According to the warrant application, Defendants Wright and Haselden were driving by Ms. Lane's house on what they called "VICE patrol."  Defendant Wright claimed to observe three men sitting on the steps in front of Ms. Lane's property "outside the fence line."[2]

17.     While driving his car, Defendant Wright observed a hand-rolled "cigar," which he claimed to believe to contain marijuana.  *See* Exhibit 1.  Defendant Wright also observed a Styrofoam cup, which he asserted "is often used by people when they drink alcohol."  *Id*.  As a result, Defendant Wright, who was wearing a tactical ballistics vest marked "POLICE," decided to pull over the car and question the men.  *Id*.

18.     Defendant Wright asked the men if they lived at the house and then asked them for identification.   Defendant Wright received Terrence Crossland's identification, which

---

[2] Despite Defendant Wright's characterization of the steps as "outside the fence line" of Ms. Lane's property, the steps are on her property, and the three men were situated on the steps before they met the public sidewalk.

indicated that he lived at the address, and asked one of the other men, Mr. Crutchfield, to put out the cigar. Mr. Crutchfield told the officer that it was not marijuana but "Scooby Snacks," a popular brand of synthetic marijuana available in stores in the District at the time.

19.   According to Defendant Wright, all three men then "consented" to a search, which turned up nothing illegal on any of them. *Id*.

20.   Defendant Wright claimed that, after the search, Mr. Crossland said that his friends could hang out with him on his porch. Defendant Wright told them that it was okay to go hang out on the porch, and the three men got up to walk up the stairs and through the yard to the porch. *Id*.

21.   Defendant Wright claimed that, after the three men got up, Mr. Boatwright failed to pick up a red jacket that was next to him. Defendant Wright told the men that they forgot their jacket, and the men allegedly denied ownership. Defendant Wright told the men that he would personally keep the bottle of Hennessey peeking out of the jacket if it did not belong to them. Mr. Crossland then allegedly stated that the jacket was his. Defendant Wright claimed not to believe Mr. Crossland because Mr. Crossland was already wearing a jacket and because Mr. Boatwright was not wearing a jacket. *Id*.

22.   Instead of allowing the men to take the jacket back, Defendant Wright, claiming that the jacket was "abandoned," then picked it up and searched it, supposedly "to ascertain true ownership." *Id*. Defendant Wright picked up the jacket even though the jacket, as well as Defendant Wright when he went to pick it up, was on private property.

23.   Defendant Wright claimed to have unzipped a pocket in the jacket and found a handgun inside the pocket.

24.     Other Defendant MPD officers were called to the scene, and the Defendants took the Styrofoam cup that had been next to Mr. Boatwright on the stairs and smelled the contents, agreeing that the liquid smelled like Hennessey.[3]  *Id.*  According to the warrant application, the officers then handcuffed and arrested all three men for possession of an open container of alcohol.  *Id*.  The possible evidentiary basis of this charge against all three men was not explained.  Officers also arrested Mr. Crutchfield for possession of synthetic marijuana for possessing the cigar.

25.     The Defendants took all three men away from the yard in front of the house to the police station.  No charges were pursued against Mr. Crossland, who was not in possession of the cup, the cigar, or the red jacket.  However, officers took his cellular phone and have never (as of the date of this Complaint) returned it, despite repeated requests.

26.     At the station, Mr. Boatwright waived his *Miranda* rights and admitted that the red jacket containing the firearm was his, that the Hennessey in the jacket was his, that the Styrofoam cup next to his foot was his, and that he had found the firearm in March.  *Id*. at 4.

27.     Even though, according to the warrant application, Mr. Boatwright confessed to the ownership of the jacket and firearm—and thereby confirmed Defendant Wright's belief that Mr. Boatwright was the owner of the jacket—Defendant Wright nonetheless sought a search warrant for the home that *Mr. Crossland* shared with his mother and grandmother.

### The Obvious Lack of Probable Cause

28.     The warrant application made by Defendant Wright to search Ms. Lane's home was egregiously lacking in probable cause.  *See generally* Exhibit 1.  No reasonable officer could have believed that it established probable cause to search the family's home.

---

[3] All of the officers entered the property without permission and without a warrant.

29.     Lacking any actual evidence connecting the home to any criminal activity, Defendant Wright asserted, based on his "training" and "experience," that he believed that "persons involved in illegal activities maintain books, records, documentation and other papers relating to the ordering, sales and servicing of their firearms."  Exhibit 1 at 5.

30.     Defendant Wright also asserted: "I also know that there [sic] people keep their firearms and ammunition inside of their homes."  *Id.*

31.     These entirely vague and conclusory statements of purported "training" and "experience" about the habits of criminals and other "people" were offered as the key factual and evidentiary link to justify the search of Ms. Lane's home.

32.     The warrant application contained not a single particularized fact to establish probable cause that a search of the home would reveal evidence of a crime, let alone the specific items sought.

33.     As this Court has held before in response to the MPD's previous efforts to search the homes belonging to those whom officers find on the street with a firearm, this kind of vague assertion about the purported habits of people "involved in illegal activities" would not even have been nearly sufficient to establish probable cause to raid and search *Mr. Boatwright's* home (the home of the person who possessed the firearm), let alone to raid and search the home of Mr. Crossland.  *See, e.g.*, *United States v. Hopkins*, 128 F. Supp. 2d 1, 7 (D.D.C. 2000).

34.     The warrant application did not present any facts remotely rising to the level of probable cause to believe that Mr. Crossland was involved in any "illegal activities," Exhibit 1 at

5, let alone that he owned a firearm, much less that he stored the specific firearms-related accessories sought by the warrant inside his grandmother's home.[4]

35.     Nor did Defendant Wright present any evidence that Mr. Boatwright had ever even been in Mr. Crossland's home (he had not), even assuming that government agents could raid any home which any person whom officers find with a firearm had recently visited.[5]

36.     Defendant Wright also ignored the fact that the home sought to be searched was Mr. Crossland's home when he purportedly justified the search by asserting in the warrant application that gun possessors keep extra guns in "their" homes.   Based on this assertion, Defendant Wright's purported justification for searching the home was also self-defeating.

37.     After the paragraph in the warrant application containing Defendant Wright's generalized statements of "training" and "experience" concerning the habits of "persons involved in illegal activities," the warrant application then sought permission for what amounted to a Colonial Era general warrant, requesting that "a Search Warrant be issued for the entire premises … for any other evidence of a crime that may be found."  Exhibit 1 at 5.[6]

---

[4] The warrant sought a detailed list of items which Defendant Wright claimed would, based on his "training" and "experience," be in Mr. Crossland's home: "Ammunition, Holsters, Targets, Gun Cleaning kits, Other Firearms, Notes, Ledgers, Documentation and other Papers Relating to the Ordering, Sales, Servicing, and use of their Firearms and Other Items Related to Illegal Possession of Firearms."  Exhibit 1 at 1.

[5] Even if agents of the government were allowed to search any home near which a person had been found in possession of a firearm (which has been rejected by this Court), and even if agents of the government were allowed to search the home of Mr. Crossland having found a firearm in the possession of a different person, the warrant application failed to allege that anyone in the house had done anything illegal or would possess evidence of any illegal gun activity because he failed to put forward any evidence that any person in the home did not have a license to possess a firearm.  As Defendant Wright knew, it was not and is not illegal to possess a firearm at one's home in the District.  Nowhere did Defendant Wright allege, as other MPD officers routinely demonstrate when seeking search warrants, that the residents of the home did not possess valid licenses or that they had been disqualified from lawful firearm ownership.

[6] Both of these generalizations are facially unreasonable.  The category of "persons involved in illegal activities" that Defendant Wright offered as a category with consistent habits, is

**The Statements of "Training" and "Experience" Contained**
**False and Reckless Statements and Material Omissions**

38.     The warrant application's vague, general, and conclusory statements of "training" and "experience" concerning what those involved in "illegal activities" and other "people" are likely to do were not only plainly insufficient to establish probable cause to search the Lane family home, they were also knowingly false, incomplete, and misleading.

39.     Defendant Wright's assertion that police were likely to find the detailed gun-related items based on his assertions of "training" and "experience" was knowingly and recklessly false.  Defendant Wright omitted to tell the Superior Court judge that, in executing similar search warrants based solely on statements of "training" and "experience" about gun possessors, MPD officers rarely find such items and that, based on information collected and produced by the MPD, it was overwhelmingly likely that the Defendants would *not* find the items listed.

40.     In cases, such as this one, in which MPD officers seek a home search warrant based only on the seizure of a firearm in a street stop and their claimed "training" and "experience," home searches rarely produce evidence of the illegal activity that police allegedly seek.  For example, records created and kept by MPD officers show that, in the one-year period surrounding and including the raid of the Lane family home, 91% of such warrants searching for guns in the District failed to find any guns in the home.

41.     The MPD is even less successful in finding the documentary evidence of gun crimes that the Defendants purportedly sought (including "ledgers," "targets," "notes," and

---

generalized beyond any reasonable meaning.  For example, a person involved in smoking synthetic marijuana outside a friend's home may have different habits than a person who drinks alcohol out of a Styrofoam cup, both of whom may have different habits than a person involved in a large firearms trafficking enterprise.  Similarly, any reasonable officer would know that police are not permitted to search a home for "any other evidence of a crime that may be found."

"papers relating to the ordering, sales, servicing, and use of their firearms," *supra* note 4).
According to MPD records, in the one-year period surrounding and including the search of the
Lane family home, MPD officers failed to find any such documentation in at least 94% (and
likely much higher) of such cases.  Seeking to expand the scope of the home search to examine
any and all private papers in the home, Defendant Wright deliberately and recklessly failed to
inform the Superior Court judge that MPD officers rarely find such items when searches are
based solely on MPD statements of "training" and "experience" rather than on evidence that
actually links the home to illegal activity.

42.     Moreover, finding such records and documentation was even less likely than the
MPD's overall 94% failure rate in Mr. Boatwright's case because he had admitted to "finding"
the firearm rather than legally purchasing it.  The odds of finding Mr. Boatwright's likely non-
existent gun-related paperwork in *Mr. Crossland*'s home (a home inside which Mr. Boatwright
had never ventured) was even more miniscule.

43.     This failure rate is not surprising given the other things that Defendant Wright
omitted from the application made to the issuing judge.  Defendant Wright failed to inform the
judge about other obviously material facts in his possession, such as that many firearms—
particularly because of the District's long history of almost uniform prohibition on guns and the
inability of many District residents to validly purchase a firearm—are passed and traded by
individuals without documentation or records, and without the person possessing any of the
receipts or accoutrements of legal gun ownership.

44.     Defendant Wright also asserted that, because bullets are not sold individually, *id.*
at 5 ("[I]t is extremely uncommon for individual rounds of ammunition to be sold."), and only
sold in "bricks" of 50, there would be additional bullets inside the home of Ms. Lane.  Citing the

same MPD "training" and "experience," however, a different MPD officer claimed under oath, to a different Superior Court judge seeking a different warrant, that, because one cannot legally purchase bullets in the District, "there are often places where you can buy loose bullets or individual bullets from other gun possessors."

45.     Defendant Wright did not bother to include in the affidavit any reason why searching the home of an *acquaintance* of a gun possessor would be justified or supported by evidence, let alone that it would be more likely to yield success than the MPD's dismal success rate in searching the homes of actual firearms possessors.

### The Warrant Application Falsely Recounted and
### Intentionally Omitted Critical Material Information

46.     In addition to the warrant application's facial invalidity and false and reckless generic statements and omissions, the warrant application also suffered from a number of significant legal and factual flaws given the actual events that occurred that day.

47.     Defendant Wright's warrant application, in addition to itself describing unconstitutional searches, failing remotely to establish probable cause, and including false and misleading statements of "training" and "experience," also knowingly and recklessly misstated and omitted critical factual information about what happened.

48.     The warrant application did not recount many of the important events leading up to the warrant application, including that the Defendants had *already* unlawfully entered and searched the home *without a warrant* and without finding anything illegal.

49.     As Defendants Wright, Haselden, and a third officer not disclosed in the warrant application were questioning the three men on the steps outside the home, the Defendants brought the three men onto the yard of the home to search them.  The Defendants had no

permission to bring the men into the yard and no permission to enter the property to search them.[7]

50.     Defendant Wright asserted that "all three individuals consented to a search."  That statement was false.  Instead, immediately after exiting the police car, Defendant Wright ordered the men to stay where they were.  After seizing the men, Defendant Wright and the other officers then immediately searched the men, including putting their hands into the pockets of the three men.  Officers did not have reasonable suspicion to stop and detain the men or probable cause to search them.

51.     After Defendant Wright allowed the men to go up to the porch to continue hanging out because he had not found anything illegal, he noticed that Mr. Boatwright had left his red jacket on the property near the steps.  Defendant Wright threatened to smash the glass alcohol bottle on the steps of the property if the men did not take the jacket, at which point Mr. Crossland asked the officer to hand him the jacket so he did not break glass on his walkway.  At that point, Defendant Wright unzipped the jacket and began searching it, later falsely claiming to the Superior Court judge that it was "abandoned" property and without revealing to the judge that the jacket had been seized from private property.

52.     When Ms. Lane heard officers outside her home and on her yard and porch, she came outside to her porch from her kitchen, where she had been watching television.  When she saw officers on her property without permission, searching and then handcuffing her grandson, she got her camera and started taking photos of where the officers were and what they were doing.  Ms. Lane wanted proof that police officers had come onto her property and seized and searched her grandson without permission.

---

[7] The men had always been seated on the front steps of the property, and officers themselves also entered onto the property to search the men.

53.     As Ms. Lane stood watching officers arresting her grandson, Mr. Crossland asked his grandmother why they were arresting him.  Officers did not explain to Ms. Lane or to Mr. Crossland what he was being arrested for.  Neither Defendant Wright nor any other officer explained to Mr. Crossland that he was being arrested for possession of an open container of alcohol, apparently for the Styrofoam cup that had been sitting next to Mr. Boatwright.

54.     After the arrests, several Defendants walked up to Ms. Lane's porch and asked Ms. Lane if they could come into her house and speak to her.  She told them that they could not but that she would talk to them outside.  The Defendants told her that they had found a gun on one of the three young men, although Ms. Lane did not know Mr. Boatwright and had never spoken to him.

55.     Defendant Wright then told Ms. Lane that he wanted to search her home.  Ms. Lane asked the officer: "Do you have a search warrant?"  Defendant Wright stated: "No, but I'm going in anyway."

56.     Defendant Wright and another Defendant officer then walked past Ms. Lane into Ms. Lane's house.  After the Defendants entered her home without permission and without a warrant, Ms. Lane attempted to follow them into the house to see what they were going to do to her belongings.  As she tried to enter her own home, she was grabbed by the arm by Defendant Haselden.

57.     Defendant Haselden forcibly pulled her back and restrained her from going back into her own house.

58.     After the two Defendants had searched the home for about 10 minutes, they exited.

59.     The search warrant application made to the Superior Court judge did not mention any of these events, including that officers had already entered and searched the home and found nothing illegal in it.

60.     Defendant Wright merely stated in the warrant application that officers were "stationed" *outside* the home to prevent the supposed destruction of "evidence."

61.     The warrant application also omitted that officers had unlawfully brought the men into the yard to search them, without permission of anyone who lived in the house.

62.     In addition, the application also misleadingly stated that Defendant Wright found the men "outside the fence line" of the home without stating that the men were sitting on the steps belonging to Ms. Lane and her property.  Thus, the Defendant Wright obscured from the Superior Court judge that his seizure of the men and the seizure of the red jacket, even independent of his unlawful search of that jacket on the absurd premise that it was "abandoned" on private property, occurred only after he had made an unauthorized entrance onto the property, supposedly to investigate a cigar and Styrofoam cup, neither of which was unlawful.

63.     Had Defendant Wright told the Superior Court judge about these illegal stops and seizures, including that he unlawfully entered the family's property in order to grab and search the red jacket, the Superior Court judge would have been obliged not to consider any evidence discovered as a result of that unlawful seizure.

**The Conduct of Officers After the Unlawful Seizures and the First Home Search**

64.     When Defendant Wright left to write the search warrant application, the Defendants ordered Ms. Lane not to go back into her home.  Ms. Lane was afraid because she was elderly, alone, and had just been forcibly restrained from walking into her own home.

65.     Three Defendants remained with then 71-year-old Ms. Lane to guard the house. They refused to permit Ms. Lane to enter her own home to get food, to drink water, or to go to the bathroom.

66.     October 27, 2012, was an uncomfortably chilly evening for Ms. Lane.

67.     After nearly four hours, Ms. Lane was finally able to use the bathroom when her daughter, Adrian Crossland, arrived after work at approximately 6:00 p.m.  Ms. Lane was then able to go to McDonald's to use the public bathroom.

68.     When Defendant Wright arrived with the warrant, Ms. Lane asked to see it.  One of the Defendants told her: "We said that we would get a warrant, not that we'd show it to you."

69.     When the Defendants refused to show the family the warrant, fearing that they were again entering their home illegally, Ms. Crossland called 911 to report that the police were entering her and her mother's home without permission.

70.     The Defendants kept Ms. Lane and her daughter, Ms. Crossland, outside the gate in front of their yard, even as it got colder.  One of the Defendant officers was deliberately holding and pushing down on the gate such that it trapped Ms. Crossland's foot, even after she told him that it was painful.

71.     After searching the home, the Defendants found nothing illegal.  When he left the house, Defendant Wright told the two women: "We didn't find anything, but we'll be back."  He then warned Ms. Lane: "If I get called back to this address again, you'll have to move."

72.     Ms. Lane had been living in the home since 1975.

73.     When the women entered the house, Ms. Lane went to her digital camera and found that the Defendant officers had deleted all of the photographs that she had taken of police unlawfully searching and arresting her grandson in the middle of her yard.

74.     The Defendants also tore apart the bedroom in which Adrian Crossland had been sleeping.  It took the family three days to clean the damage done by officers.[8]

75.     The experience traumatized and humiliated the Plaintiffs.

76.     Mr. Crossland spent the weekend in jail due to his unlawful arrest prior to being released without charge.  There was no probable cause to believe that he had committed any offense.

77.     The courthouse was closed on the following Monday, and Mr. Crossland was therefore not released until his case was no-papered on Tuesday, October 30.  He spent three days locked in jail due to the patently unlawful arrest.

78.     The Defendants took Mr. Crossland's phone during his arrest and refused to leave it with Ms. Lane at the home.  Despite repeated requests, the phone has never been returned.

### The MPD's Policies and Practices

79.     The Defendants in this case attempted to turn a street stop and arrest into an automatic raid and search of a home.  To accomplish that, the Defendants relied on vague, facially insufficient, unsubstantiated, and grossly misleading and intentionally incomplete statements of "training" and "experience."

80.     Through training its officers to use these statements of "training" and "experience" and by supplying the content of that "training," the MPD has begun an initiative to conduct home raids, sometimes at multiple homes, in every situation in which officers find a firearm in the possession of a person anywhere in the District, based not on any actual police work or evidence linking the home to a firearm, but based on false and misleading statements

---

[8] Ms. Lane's brother returned to the home while officers had sealed the property.  He sought to get his dentures because he had a date, but he was not permitted into the home to get his teeth.

about the habits of a generic category of people that it labels "criminal," "gun possessors," or "persons involved in illegal activities."

81.     The MPD trains its officers that, based on bare bones affidavits like Officer Wright's and assertions of "training" and "experience" like the ones he made, any MPD officer is able to turn any gun arrest anywhere in the District into an automatic home raid, even though officers know that they are overwhelmingly unlikely to find the evidence that they claim to seek.

82.     The MPD has adopted a pattern, policy, and practice of instructing its officers to obtain and execute search warrants at the alleged residences of people on whom they find firearms during traffic and street stops—as well as, in some cases, the residences of any person with any person who is found with a firearm.  The MPD employs this pattern, policy, and practice despite the obvious lack of any evidentiary connection to the residence and rulings from this Court that such subsequent home raids based solely on possession of a firearm somewhere outside the home clearly lack probable cause.

83.     In the one-year period including the execution of the warrant in this case, MPD officers (including dozens of officers and supervisors from police districts throughout the City) employed materially similar statements based on the MPD's "training" and their "experience" after street arrests involving firearm possession in order to execute at least 56 home searches; these MPD raids resulted from incidents in which police claimed to find firearms during a street stop but presented no other evidence linking the home to any criminal activity.

84.     MPD officers are trained by the MPD to substitute these and materially similar statements of "training" and "experience" for traditional evidence when they want to search a particular location but lack any evidence about the home itself.

**<u>Claims for Relief</u>**

**One:   The Warrant Application Was So Lacking in Probable Cause that No Reasonable Officer Could Have Relied on It in Good Faith.**

85.      Plaintiffs incorporate by reference the allegations in paragraphs 1-84 above.

86.      The Defendants obtaining and executing the search warrant for the Plaintiffs' home relied on a warrant application that was so facially lacking in probable cause that no reasonable officer could have relied on it in good faith to search the family's home.  The warrant utterly failed to provide any evidence linking the home to any criminal activity, let alone to establish probable cause that the specific gun-related items sought would be found.  The reliance on such an application to search the home clearly violated the Fourth Amendment.

**Two:   The Warrant Application Contained Statements that Were Knowingly and Recklessly False and Made Material Omissions.**

87.      Plaintiffs incorporate by reference the allegations in paragraphs 1-86 above.

88.      Defendant Wright's application presented to the Superior Court judge contained statements of "training" and "experience," as well as statements concerning the seizures, searches, and arrests outside the home, that were knowingly and recklessly false and misleading. The application also omitted material facts known to Defendant Wright that, if presented, would have undermined the asserted probable cause basis for issuing the warrant.   The Fourth Amendment prohibits obtaining a warrant on the basis of knowingly and recklessly false and misleading assertions as well as the knowing and reckless omission of material information.

**Three:   The Warrant Application Relied on Information Obtained in an Unconstitutional Manner.**

89.      Plaintiffs incorporate by reference the allegations in paragraphs 1-88 above.

90.      The warrant application relied on material information derived from the unconstitutional seizure and search of Mr. Crossland, Mr. Boatwright, and Mr. Crutchfield, as

well as from the unlawful search of the red jacket.  Because evidence of the firearm was found through the unlawful seizures and searches, that information was improperly included in the warrant application and renders any home search performed on the basis of unconstitutional activity a violation of the Fourth Amendment.

**Four:  The Obvious Lack of Probable Cause and False and Reckless Statements and Omissions Were the Result of a Policy, Pattern, and Custom of the MPD and the Result of the MPD's Failure Properly to Train and Supervise its Officers.**

91.     Plaintiffs incorporate by reference the allegations in paragraphs 1-90 above.

92.     The MPD has established a pattern, policy, and practice of training its officers to include in search warrant applications statements of "training" and "experience" that are unsubstantiated, vague, self-defeating, contradictory, woefully insufficient to substitute for actual evidence, incomplete, and materially false and recklessly misleading.  The MPD has established a pattern, policy, and practice of training its officers to use such statements of "training" and "experience" about the habits of people that officers stop on the street to substitute for any actual evidence or police investigation into any evidentiary link to a particular residence.  Despite having knowledge of the fatal factual and legal flaws in these statements, the MPD has failed to train and supervise its officers on the Fourth Amendment standards for obtaining highly intrusive home search warrants.  As a result, MPD officers from every Police District routinely seek and execute extraordinarily intrusive, dangerous, and demeaning search warrants based on a web of insufficient, false, misleading, and unsubstantiated assertions.

**Five:  The Defendants Entered and Searched the Plaintiffs' Home and Property Without a Warrant**

93.     Plaintiffs incorporate by reference the allegations in paragraphs 1-92 above.

94.     The Defendants entered and searched the Plaintiffs' home prior to obtaining a warrant in violation of the Fourth Amendment.   Officers also entered and remained on the property without a warrant and without permission.

**Six: The Defendants Illegally Seized Ms. Lane**

95.     Plaintiffs incorporate by reference the allegations in paragraphs 1-94 above.

96.     Defendant Haselden unlawfully grabbed Ms. Lane and forcibly restrained her from going into her own home.   Three Defendants kept Ms. Lane on her porch and unlawfully denied her entry into her own home for a period of six hours, refusing to let her eat, get water, or use the bathroom.   The seizure of Ms. Lane on her own porch violated the Fourth Amendment.

**Seven:   The Defendants Unlawfully Seized, Searched, and Arrested Mr. Crossland and Unlawfully Retained Possession of His Cellular Phone**

97.     Plaintiffs incorporate by reference the allegations in paragraphs 1-96 above.

98.     The Defendants unlawfully seized and searched Mr. Crossland without reasonable suspicion or probable cause to believe that he had committed any offense.   Defendants unlawfully arrested Mr. Crossland without probable cause to believe that he had committed any offense.   After his arrest, officers unlawfully took his cellular phone and have failed to return it, even though no charges were pursued against Mr. Crossland and despite repeated requests for the return of the phone.   The seizure, searches, and arrest of Mr. Crossland violate the Fourth Amendment, and the continued retention of Mr. Crossland's property without providing any notice or opportunity to be heard about the taking of the property and without ever returning the property, violates the Fourth and Fifth Amendments.

**Eight:   The Defendants Exceeded the Scope of the Warrant, Used Excessive Force, Made Unnecessary and Unreasonable Seizures Not Authorized By the Warrant, and Engaged in Conduct that Shocks the Conscience in Violation of the Fourth and Fifth Amendments.**

99.     The Plaintiffs incorporate by reference the allegations in paragraphs 1-98 above.

100.     In addition to the string of humiliating unconstitutional seizures committed by Defendants when they unlawfully entered the Plaintiffs' property—including the forceful detention of 71-year-old Ms. Lane on her porch for six hours to prevent her from re-entering her own home—the Defendants also exceeded the scope of the warrant by examining Ms. Lane's digital camera and deleting photographs that she had taken of police misconduct.   The Defendants also taunted and threatened the family, causing them to believe that they were in danger of losing the home that Ms. Lane had occupied since 1975.   The unlawful, painful, and unjustified seizures, taunts, and threats made to innocent and vulnerable people on their own property shock the conscience and violate the Fourth and Fifth Amendments.

### **Request for Relief**

WHEREFORE, Plaintiffs request that this Court issue a judgment against the Defendants:

a.  Holding the appropriate Defendants liable to the Plaintiffs for compensatory damages in an amount appropriate to the proof adduced at trial;
b.  Holding the appropriate Defendants (other than the District of Columbia) liable to the Plaintiffs for punitive damages in an amount appropriate to the proof adduced at trial;
c.  Awarding to plaintiffs their costs and reasonable attorneys' fees; and
d.  Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,


   */s/ Alec Karakatsanis*_____
Alec Karakatsanis (D.C. Bar No. 999294)

Equal Justice Under Law
916 G Street, NW #701
Washington, D.C. 20001
(202) 681-2409

*Attorney for Plaintiff*

Date: August 4, 2014