**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Ella Lane et al., | ) | |
| Plaintiffs. | ) | |
| v. | ) | Case No. 1:14-cv-1316 (RBW) |
| THE DISTRICT OF COLUMBIA, et al. | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS

## TABLE OF CONTENTS


I. The Invalidity of the Search Warrant……………………………….……………..……...2

A. The Warrant Application Obviously Lacked Probable Cause………….…………….......3

1. Probable Cause Requires Specific Facts Connecting the Place to Be Searched to Criminal Activity……………..……….…………………….….…4

2. There Is No Fourth Amendment Exception for the Category of People Who Are or Who Associate With Gun Possessors ..................................................10

3. The Warrant Application So Lacked Probable Cause that Reliance on the Application Was Not Objectively Reasonable……………………………...….…14

B. The Application Relies on False and Misleading Statements and Omissions………......16

1. The False and Misleading Statements of "Training" and "Experience"…….………16

2. The False Statements Concerning the Events of October 27, 2012………..……..22

C. The Warrant Improperly Relied on Information Obtained in Unconstitutional and Illegal Searches and Seizures……..………………..…….……….23

1. The Defendants Misunderstand the Law Applicable to the Plaintiffs' Claims……...24

2. The Defendants Concede the Illegality of the Seizures and Searches………………27

II. The Defendants' Illegal Searches and Seizures…………………………………………..…28

A. The Unlawful *Terry* Stop of Mr. Crossland……………………………………….…….28

B. The Unlawful Search of Mr. Crossland…………………………………………………29

C. The Trespass Inside the Plaintiffs' Yard to Detain and Search Mr. Crossland……..….29

D. The Unlawful Arrest of Terrence Crossland……………………………………………30

E. The Warrantless Search of the Home…………………………………………………...33

F. The Unlawful Seizure of Ms. Lane…………………………………………………..…37

G. The Destruction of Evidence from Ms. Lane's Digital Camera………………………..39

H. The Seizure and Retention of Mr. Crossland's Cellular Phone………………………...39

I. The Conduct of the Defendants Shocks the Conscience...............................................39

III. Municipal Liability ……………………………….……………………………....40

IV. Conclusion……………………………………………………………………….....41

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Ella Lane et al., | ) | |
| Plaintiffs. | ) | |
| v. | ) | Case No. 1:14-cv-1316 (RBW) |
| THE DISTRICT OF COLUMBIA, et al. | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS**

This case raises important and systemic issues of police misconduct in seeking and executing search warrants in the District of Columbia. The Plaintiffs allege the widespread use of facially insufficient, false, and misleading statements of "training" and "experience" in MPD warrant applications, the deliberate attempt to hide from a state-court judicial officer illegal police activity on which the warrant application in this case was based, and a series of outrageous and unreasonable actions by government employees when they arrived at the Plaintiffs' home. These questions are of particular importance for African American families in D.C. who, despite making up less than half of the District's population, are the subject of well over nine out of every ten "training" and "experience" based home raids in the city.

The Defendants' Motion to Dismiss, Doc. 9, misunderstands the law applicable to the Plaintiffs' claims and fails to engage meaningfully with the most relevant allegations. It does not even address several of the Plaintiffs' dispositive claims. Taken as a whole, the Defendants' Motion promotes a dangerous vision of municipal government power—one that is inconsistent with longstanding constitutional principles establishing the need for specific and truthful justifications for serious intrusions on individuals' private lives. The Motion should be denied.

## I. The Invalidity of the Search Warrant

For over two hundred years, "the central concern underlying the Fourth Amendment" has been ensuring that police officers do not have "unbridled discretion to rummage at will among a person's private effects." *Arizona v. Gant*, 556 U.S. 332, 345 (2009). The comprehensive search of a person's private home has long been viewed as among the most intrusive and exceptional acts of government power, even before those searches became heavily militarized. *Illinois v. Rodriguez*, 497 U.S. 177, 191 (1990) ("[T]he physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.") (quotations omitted); *Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949) ("The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society."). At a minimum, a search warrant means government agents entering a private home and examining a person or a family's most intimate writings and belongings, collected over and documenting a lifetime of experiences.

As a result, agents of the government seeking to enter a private home and to inspect a family's most personal possessions are required to present a sworn affidavit setting forth good reasons to justify that intrusion. Once police secure a valid warrant, officers are ordinarily not liable if they rely on the warrant to search a home. *United States v. Leon*, 468 U.S. 897 (1984). *Leon* protects police officers so long as they act in good faith and with objective reasonableness. However, police officers must still exercise "reasonable professional judgment," *Malley v. Briggs*, 475 U.S. 335, 346 (1986), and, because "it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should," police officers will be held liable if their reliance is not reasonable. *Id*. at 345-46. *Malley* therefore adopted the "objective reasonableness"

rule of *Leon* as the same rule governing whether police officers are entitled to qualified immunity in civil cases. *Id*.

There are important circumstances under *Leon* and *Malley* in which police reliance on a warrant is not acceptable. 468 U.S. at 923. These circumstances include warrant applications that are so lacking in evidence of probable cause that reliance on them is unreasonable, *see id*.; instances in which the warrant relies on false information or the issuing judge was misled by the omission of material information, *see Franks v. Delaware*, 438 U.S. 154, 165 (1978); and warrant applications that are themselves based on the fruits of unconstitutional police conduct, *see Murray v. United States*, 487 U.S. 533, 540 (1988).

All of these circumstances apply in this case: (1) Defendant Wright's warrant application was so lacking in probable cause on its face that no reasonable officer would have relied on it, (2) the warrant application relied on false information and omitted material information, and (3) the warrant application was based on the fruits of unlawful police conduct.

**A. The Warrant Application Obviously Lacked Probable Cause**

Searches of a person's body incident to an arrest are now well accepted in American policing. However, the question of whether the District's police can quietly create a radical new policy of "searches of entire homes incident to arrest" deserves much more critical analysis. This case raises the question whether, by virtue of an opinion offered by an officer about the habits of "persons involved in illegal activities," Doc. 1-1 at 5, the home of that person—as well as the home of any person who associates with that person—can be raided and searched by government agents any time an arrest for firearm possession is made.

The first issue in this case is therefore simple: Does probable cause exist to execute a search warrant for a home based solely on arresting a person who lives there for a gun offense when

officers possess not a single other piece of evidence that the home is or has ever been linked to any criminal activity?[1] The MPD has begun a policy of violently raiding and searching homes when it finds a firearm during a traffic or a street stop, and it did so for the homes of at least 56 families all over the District during the year surrounding the search of the Plaintiffs' home. Doc. 1 at ¶ 83. In none of those cases did officers possess any evidence linking the home to any criminal activity. Instead, the enormously intrusive home raids and searches were predicated entirely on statements, like those of Defendant Wright, about the habits of "persons involved in illegal activities." Doc. 1-1 at 5.

The result is a new system in which an entire class of criminals—those arrested for gun possession and those hanging out with those arrested for gun possession—are subject to routine search of their homes, not because of any evidence about their home, but because of the category of criminal that they are alleged to be. To understand how radical a departure these non-evidence "training" and "experience" based home raids are from long established Fourth Amendment principles, it is important to discuss the caselaw that the Defendants ignore.

**1. Probable Cause Requires Specific Facts Connecting the Place to Be Searched to Criminal Activity**

The Defendants first argue without explanation, Doc. 9 at 9-10,[2] that probable cause existed on the face of the warrant application. The two pages devoted by the Defendants to this argument pick some of the facts from the application and list them for the Court. This recitation fails to

---

[1] As discussed *infra* at 12, Mr. Crossland was not even believed to have possessed the firearm, and the Defendants knew that the gun belonged to another person, who had already confessed in detail to finding the stolen firearm the previous March.

[2] Because the Defendants combine two documents with separate pagination (both titled "Motion to Dismiss") into a single electronically filed document, the pagination in the Defendants' memorandum of law differs from the pagination assigned by ECF. For purposes of consistency, the Plaintiffs' citations to those documents will use the ECF pagination.

acknowledge key assertions made in the affidavit, to discuss any caselaw, or to make any argument that could support the notion that probable cause existed to search the family's home.

To obtain a search warrant, police officers must demonstrate "probable cause" to believe that evidence of a crime will be found in the particular place that they want to search. While flexible and based on common sense, the "probable cause" standard is rigorous. As classically formulated, it requires that "the facts and circumstances … are sufficient in themselves to warrant a [wo]man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (quotations omitted). In the search warrant context, this standard means that a warrant application must provide evidence sufficient for a reasonable person to believe that evidence of criminal activity will be found in the particular place to be searched. *See, e.g.*, *United States v. Nolan*, 199 F.3d 1180, 1183 (10th Cir. 1999) ("The test is whether the facts presented in the affidavit would warrant a [wo]man of reasonable caution to believe that evidence of a crime will be found at the place to be searched."); *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) ("It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched.") (quotations omitted).

The Fourth Amendment therefore requires evidence specifically linking the place to be searched to criminal activity, and it is not sufficient to declare merely that a criminal lives there. As the Supreme Court has made clear:

> The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought.

*Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978); *United States v. Grubbs*, 547 U.S. 90, 96 (2006). The *Zurcher* rule is not some inconvenient preference; it is an emphatic and longstanding requirement of the Fourth Amendment.

Numerous federal cases affirm the fundamental proposition that a warrant application must provide specific information that evidence of a crime will be found at the particular place to be searched. *See, e.g., United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) ("[T]he affidavit must suggest that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought and not merely that the owner of property is suspected of crime.") (quoting *Zurcher*, 436 U.S. at 556 (internal quotations removed)); *United States v. Lalor*, 996 F.2d 1578, 1583 (4th Cir. 1993) (noting that "residential searches [are] upheld only where some information links the criminal activity to the defendant's residence"); *Martin*, 297 F.3d at 1314 ("[T]he affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity.").

Defendant Wright's approach—which the Defendants defend without explanation—is to attempt a way around these common-sense principles by claiming that he "knows" that all "persons involved in illegal activities," Doc. 1-1,[3] habitually keep long lists of broad categories of evidence of their crimes in their home. That purported knowledge, the theory goes, substitutes for any specific evidence about any particular person and any particular location. If accepted, this rationale would eviscerate the *Zurcher* "critical element" rule and the historic body of constitutional

[3] The Defendants' Motion tries to narrow this category to gun possessors and their associates. The document at issue here, though, is Defendant Wright's application, Doc. 1-1, which purported to support a search based on vague assertions about all "persons involved in illegal activities." In any case, the *Zurcher* rule makes clear that attempts to search homes without any evidence and based on categorical assertions about the habits of gun possessors and their associates would fail for the same reasons.

principle that it reflects. Any government officer could, at any time, assert that any kind of criminal has a habit of keeping evidence of his or her crime at home, and any arrestee's family home could automatically be subject to comprehensive search by government employees.

Federal courts have repeatedly rejected search warrants based on allegations of criminal activity that did not sufficiently establish that evidence of the crime would be present at the particular location to be searched. In *United States v. Rowland*, 145 F.3d 1194, 1204 (10th Cir. 1998), the court found that the warrant lacked probable cause because "there must be additional evidence linking the person's home to the suspected criminal activity."[4] *See also, e.g. Hendricks*, 743 F.2d 653 (finding warrant invalid because the affidavit provided no evidence that Hendricks would take the contraband to his home after collecting it at the airport). In *Lalor*, 996 F.2d at 1579–83, the affidavit contained information from two informants that Lalor was selling cocaine and corroborated key aspects of that information, including Lalor's arrest for drug distribution five days earlier. But nothing in the affidavit showed a particular connection to the residence or linked any of the drug sales to the residence. In rejecting the sufficiency of the affidavit, the court explained: "In determining whether a search warrant is supported by probable cause, the crucial

[4] In *Rowland*, the affidavit established that Rowland had ordered child pornography to his post-office box and that agents intended to make a controlled delivery to the post-office box. It stated that agents had seen Rowland collect his mail at that box in the past and then walk back to work at a local government agency. The affidavit concluded that he would likely take the material back to his office and then, later, to his home. But the court explained that the "affidavit contained no information suggesting that Rowland had previously transported contraband from his private post office box to his home or that he had previously stored contraband at his home. *Nor did the affidavit provide any facts linking Rowland's residence to suspected illegal activity, such as in the past having similar video tapes or other illegal materials delivered directly to his home.*" 145 F.3d at 1204 (emphasis added). The court noted, *id*. at 1205, that one could infer that Rowland would not watch or store the videos at his government office, but held:

> Rowland's home, however, was but one of an otherwise unlimited possible sites for viewing or storage. The Carr affidavit provided no basis to either limit the possible sites or suggest that Rowland's home was more likely than the otherwise endless possibilities. As a consequence, the possible inference that Rowland would take the tapes home, in and of itself, is insufficient to provide a substantial basis for concluding there was probable cause to believe the contraband would be in Rowland's home at the time the search was to take place.

element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *Id*. at 1582.

Equating probable cause for an arrest with probable cause to search a person's home thus risks allowing search of a residence in every case in which a person is arrested, thereby compromising a wholly different set of fundamental interests. As the Supreme Court explained:

> An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

*Steagald v. United States*, 451 U.S. 204, 213 (1981); *see also, e.g., United States v. Schultz*, 14 F.3d 1093, 1097-98 (6th Cir. 1994) (holding that although the training and experience of a police officer may be considered in weighing probable cause, "it cannot substitute for the lack of evidentiary nexus" because "[t]o find otherwise would be to invite general warrants authorizing searches of *any* property owned, rented, or otherwise used by a criminal suspect—just the type of broad warrant the Fourth Amendment was designed to foreclose."); *United States v. Rios*, 881 F. Supp. 772, 775 (D. Conn. 1995) (holding that an affidavit containing an officer's expert opinion but no facts to support an inference that evidence of the person's criminal activity would be found at his home did not provide a substantial basis for a finding of probable cause). The court in *United States v. Gomez*, 652 F. Supp. 461, 463 (E.D.N.Y. 1987), explained the fundamental concern:

> [When] there is nothing to connect the illegal activity with the arrested person's apartment, to issue a warrant based solely on the agent's expert opinion would be to license virtually automatic searches of residences of persons arrested for narcotics offenses.

*See also United States v. Rosario*, 918 F. Supp. 524, 531 (D.R.I. 1996) ("To permit a search warrant based solely upon the self-avowed expertise of a law-enforcement agent, without any other

factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect."); *United States v. Kenney*, 595 F. Supp. 1453, 1461 (D. Me. 1984) ("Although there need not be absolute proof that an alleged drug dealer keeps his drugs, records, etc. at his home, there must be some indication that the home is implicated to warrant the major intrusion of a search."); *United States v. Guzman*, 1998 WL 61850 at *4 (S.D.N.Y. Feb. 13, 1998) ("Permitting a search warrant based solely on the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect."). *Guzman* went on to warn of the policy now being implemented by the MPD:

> By way of expert opinion, law enforcement agents could effectively eviscerate the rule that probable cause to arrest an individual does not, in and of itself, provide probable cause to search that person's home or car.

*Id*. (quotations, citation, and alteration omitted).[5]

A few months ago, the Supreme Court held in *Riley v. California*, 134 S. Ct. 2473 (2014), that a person's cellular phone could not be automatically searched incident to an arrest. Instead,

---

[5] *See, e.g.*, *State v. Mische*, 448 N.W.2d 415, 422 (N.D. 1989) ("We do not conclude that general allegations that contraband may be kept at the residence of the person involved cannot be considered in establishing probable cause to issue a warrant. However, in view of the special protection given to the home…something additional and more objective than the facile conclusion that contraband is ordinarily kept in the home should be required to establish probable cause to search that home."); *State v. Thein*, 977 P.2d 582, 588 (Wash. 1999) ("Most courts, however, require that a nexus between the items to be seized and the place to be searched must be established by specific facts; an officer's general conclusions are not enough."); *State v. Rabb*, 920 So.2d 1175, 1187–88 (Fla.App.2006) (holding that the police lacked probable cause to search a home for marijuana when they found three marijuana cigarettes on a person and marijuana cultivation books in his car); *People v. Pressey*, 126 Cal.Rptr.2d 162, 169 (2002) (concluding that probable cause to search a suspected drug user's residence requires more than the inference that drug users often keep drugs at home); *Ex parte Perry*, 814 So.2d 840, 843 (Ala. 2001) (holding that "a defendant's possession of illegal drugs does not, without more, make reasonable a search of the defendant's residence"); *State v. Johnson*, 589 N.W.2d 108, 116 (Neb. 1999) (holding that the warrant to search a house lacked probable cause when police found a vial of methamphetamine on the defendant); *State v. Rangitsch*, 700 P.2d 382, 388 (Wash. App. 1985) (stating that the officer's statement in the affidavit that "habitual users of drugs keep drugs and paraphernalia in their home" was "mere speculation").

the Court held, a separate warrant must issue demonstrating that probable cause exists to search the contents of the phone. The Court analogized phones to its historical precedent concerning a person's home, explaining that the "search of the arrestee's entire house was a substantial invasion beyond the arrest itself." *Id*. at 2488. The Court once again quoted, as it had in *Chimel v. California*, 395 U.S. 752 (1969), Judge Learned Hand's formulation: "it is a totally different thing to search a man's pockets and use against him what they contain, from ransacking his house for everything which may incriminate him." *Riley*, 134 S.Ct. at 2490-91 (quoting *United States v. Kirschenblatt*, 16 F.2d 202, 203 (2d Cir. 1926). *Riley* therefore relied on *Chimel*'s classic analysis:

> It is argued in the present case that it is 'reasonable' to search a man's house when he is arrested in it. But that argument is founded on little more than a subjective view regarding the acceptability of certain sorts of police conduct, and not on considerations relevant to Fourth Amendment interests. Under such an unconfined analysis, Fourth Amendment protection in this area would approach the evaporation point. It is not easy to explain why, for instance, it is less subjectively 'reasonable' to search a man's house when he is arrested on his front lawn—or just down the street—than it is when he happens to be in the house at the time of arrest.

395 U.S. at 764-65. *Chimel* thus makes clear the independent importance of obtaining a separate search warrant that is itself supported by probable cause to believe that evidence of a crime will be found in the home.

But *Riley* and *Chimel*—and the principles that they reflect—would "evaporate" if police could ignore *Steagald* and *Zurcher*: if obtaining a warrant were automatic after a gun arrest without any single other piece of particular evidence to suggest that a search of the home would yield additional evidence. The entire point of *Riley* is that, after an arrest, a separate specific (and truthful, *see infra*) showing of probable cause must be made to a neutral magistrate that the *additional place sought to be searched* will contain evidence of the crime.

**2. There Is No Fourth Amendment Exception for the Category of People Who Are or Who Associate With Gun Possessors**

The Defendants do not discuss the only case in which this Court has expressly addressed the question at issue here. This Court has previously warned the MPD that searches like the one here fall "far short" of probable cause with its holding in *United States v. Hopkins*, 128 F. Supp. 2d 1, 7 (D.D.C. 2000) (cited in the Plaintiffs' Complaint, Doc. 1 at ¶ 33). Although Judge Lamberth's decision in *Hopkins* directly addresses the question presented here, the Defendants do not even cite it. In *Hopkins,* this Court confronted a search warrant for guns and related accessories at a home based on the arrest of a subject outside of the home. In holding that the warrant lacked probable cause, this Court explained:

> Cutting away then all of this superfluous information, one is left with little more than "bare bones." The only references to firearms are the following: (1) Mr. Hopkins had been arrested on a firearms violation in the general proximity of his residence (1–3 blocks) less than seventy-two hours earlier, (2) Mr. Hopkins had been arrested on a firearms violation on August 28, 1998 [the previous year], (3) Mr. Ashley has participated in over 150 arrests and warrants for narcotics violations, but some unknown number of arrests for firearms and weapons violations. These three references fall far short of providing probable cause that Hopkins had firearms and related accessories in his residence.

*Id*. at 7 (citation omitted). *Hopkins* served as a warning to MPD officers that seeking to search a home based on a firearms arrest near the home without providing any other evidence to believe that the home was involved in any illegal activity was not sufficient. As Judge Lamberth explained, "the inference made in this case amounted to the following: suspects who are arrested for gun violations twice in fifteen months have illegal guns and related accessories in their home. This is simply not enough to support a finding of probable cause." *Id*.

If the warrant application in *Hopkins* fell "far short" of providing probable cause, the warrant application in this case was significantly worse. Indeed, in *Hopkins*, the suspect had an arrest the previous year for another firearms violation (suggesting a pattern of gun possession) and was himself found in possession of a firearm. Here, the warrant application provided no

information at all about Mr. Crossland (let alone any history of gun possession or other criminal behavior), and he was not even the person who officers suspected of possessing the firearm nor the person who confessed to officers of having found the stolen firearm in March. Indeed, Mr. Boatwright's confession to possessing and owning the firearm even included specific details about the gun's attributes as well as the date that Mr. Boatwright had found it. Doc. 1-1 at 4.

The Defendants' only attempt to confront the glaring fact that the gun did not even belong to Mr. Crossland is to assert that Mr. Crossland initially claimed that the red jacket was his when Defendant Wright first threatened to take for himself the bottle of alcohol from the jacket. This statement is both false and inconsequential. First, as discussed *infra*, Mr. Crossland never claimed that the jacket was his; Defendant Wright made that false statement in the warrant application as part of a series of false and misleading assertions. Doc. 1 at ¶ 51. More importantly, though, the warrant application makes clear that no one, not even Defendant Wright, believed the gun to be Mr. Crossland's. Defendant Wright claimed throughout the warrant application that he believed the red jacket to be Mr. Boatwright's because Mr. Boatwright was the only man not already wearing a jacket and because the jacket was "next to" where Mr. Boatwright was sitting. Doc. 1-1 at 2-3. Then, Mr. Boatwright admitted to owning the red jacket, admitted to owning the bottle of alcohol found in the red jacket (which he had been drinking using the Styrofoam cup found next to his left foot), and admitted to having found the firearm. Doc. 1-1 at 4. Most critically, Mr. Boatwright further explained to officers that he had found the stolen firearm in March, that the firearm was not registered, and that the firearm was a .25 caliber gun with 6 rounds loaded. *Id.* Mr. Boatwright's admissions and detailed knowledge about the gun, combined with Defendant

Wright's observations, render even more remote that "documents" and "papers" and "items" related to that "stolen" gun would likely be found in *Mr. Crossland*'s home.[6]

Left with nothing else, the Defendants are forced to make the remarkable assertion that, even though the firearm was found in Mr. Boatwright's possession and even though Mr. Boatwright did not live on the property (and had *never even been inside*, Doc. 1 at ¶ 35), "By the very low standard of probable cause, the officers reasonably concluded that other evidence related to the gun may be located on the property." Doc. 9 at 11. The dangerousness of this statement is self-evident. Whatever one thinks about the guilt-by-association principle underlying the Defendants' conclusory argument, the District of Columbia's assertion that "probable cause"—the standard by which an otherwise free human being can be arrested, jailed, publicly charged, indicted, and detained prior to trial, as well as the standard that allows a family to have their entire home raided by armed agents and every possession inspected and scrutinized by government employees—is a "very low standard" finds no support in the constitutional history of this country. Probable cause is certainly a lower bar than conviction would require, but it is still a rigorous standard that requires enough evidence to convince a reasonably cautious person to believe something. *Brinegar*, 338 U.S. at 175-76. Reasonably cautious people do not form beliefs using

[6] Equally troubling, therefore, was the purported search for "Ammunition, Holsters, Targets, Gun Cleaning kits, Other Firearms, Notes, Ledgers, Documentation and other Papers Relating to the Ordering, Sales, Servicing and use of their Firearms and Other Items Related to Illegal Possession of Firearms." Doc. 1-1 at 1. There was no basis whatsoever provided in the application for any person to believe that any of these documents and "other items" would be present in the home. There was not even an assertion that they would be kept by a person who is merely hanging out with a gun possessor, let alone for a gun that police knew to be *stolen* and that likely carried with it no paper documentation. The Defendants offer no explanation for the patently overbroad list in their Motion. *See Marron v. United States*, 275 U.S. 192, 196 (1927) ("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.").

The significance of the overly broad warrant is therefore that it purported to allow the officers raiding the home the ability to examine every piece of paper in the family's home in search of vague and unexplained lists of hypothetical evidence of criminal activity. That kind of penetrating search through every document can be justified only by particularized evidence that examination of those materials is justified by particularized probable cause. *See Harris v. United States*, 331 U.S. 145, 152 (1947) ("The same meticulous investigation which would be appropriate in a search for two small canceled checks could not be considered reasonable where agents are seeking a stolen automobile or an illegal still.").

a "very low standard." The Fourth Amendment was not ratified to preserve fundamental privacy and basic liberties from government intrusion by a "very low standard" that could be met by the mere fact that a gun possessor is sitting on one's front steps on a single occasion.

**3. The Warrant Application So Lacked Probable Cause that Reliance on the Application Was Not Objectively Reasonable**

As discussed in Sections I.B and I.C, *Leon* and *Malley* do not save Defendant Wright's deficient warrant application because this case involves the kind of false, misleading, and fraudulent statements designed to mislead the issuing magistrate that Judge Lamberth explicitly noted were absent in *Hopkins*, *see infra* at 16-23, and because the application was based on the fruits of unconstitutional police behavior, *see infra* at 23-28. However, even had the information in Defendant Wright's application been truthful and lawfully obtained, it would still have been so lacking in evidence to establish probable cause that reliance on it was not reasonable.

Judge Lamberth went on to hold in *Hopkins* that the *Leon* "good faith" exception applied because officers "assumed that one who has a past of carrying guns, and has just recently carried a gun near his home is likely to have gun paraphernalia in his home," 128 F. Supp. 2d at 9, and because this assumption was "not absurd" such that their behavior was unreasonable. *Id.* at 10. Thus, the *Leon*/*Malley* shield does not apply in this case for at least two additional reasons: (1) The application in this case was far weaker than that in *Hopkins* because there was no "past of carrying guns," and because *someone else* other than the person whose home was searched possessed and owned the gun; and (2) The existence of *Hopkins* put reasonable officers in this jurisdiction on notice that those circumstances fell "far short," *id*. at 7, of probable cause to invade a family's home. Instead of heeding that warning, the MPD has, in recent years, reinvigorated a program and pursued a concerted city-wide effort, as alleged in the Complaint, Doc. 1 at ¶ 83, to automatically search the homes of people found with a firearm anywhere in the District. This is

not only an enormous and dangerous extension of government authority, but it signals a complete disregard for the principles that this Court announced to the MPD in *Hopkins*.

Defendant Wright attempted to get around the lack of any evidence about the home and legal precedent requiring particularized probable cause by asserting that he "knows" that "persons involved in illegal activities" keep in their homes numerous papers and items "relating to the ordering, sales and servicing of their firearms." Doc. 1-1 at 5. It is difficult to imagine what is meant in the federal caselaw by "bare bones" warrant applications if not vague and conclusory language like this. *See Illinois v. Gates*, 462 U.S. 213, 239 (1983) (condemning "bare bones" applications that seek "a mere ratification of the bare conclusions" of an officer on the questions critical to probable cause). On the sole basis of these assertions about the most generic category of human beings—"persons involved in illegal activities"—Defendant Wright requested to search an entire home "for any other evidence of a crime that may be found." Doc. 1-1 at 5; *see Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (explaining that the Fourth Amendment prohibits "wide-ranging exploratory searches"); *United States v. Maxwell*, 920 F.2d 1028, 1031 (D.C. Cir. 1990).

The application in this case thus woefully lacked probable cause and, even were it not full of falsities and illegally obtained information, no reasonable officer could have concluded that it provided sufficient evidence for a reasonably cautious person to conclude that the specific items sought (including holsters, gun cleaning kits, ledgers, targets, "other items," and numerous types of ownership and servicing paperwork) would be inside the home. Allowing agents of the government to rummage through all of the belongings and documents of Ella Lane and her family in the home in which she had lived since 1975 because of a firearm found outside the home in the possession of another person, without a single fact establishing that the house had ever been

involved in criminal activity, would work a fundamental and unreasonable alteration to the meaning of the Fourth Amendment and to the balance of power in our community.

**B. The Application Relies on False and Misleading Statements and Omissions**

The warrant application in this case contains two main categories of false statements and omissions. First, and most generally, the application critically relies on statements about the purported general habits of "persons involved in illegal activities," Doc. 1-1 at 5, that are knowingly and recklessly false and misleading. Second, the warrant application contains false statements about what actually happened on the scene that were designed both to bolster probable cause and to mislead the issuing judge into believing that the evidence being evaluated was obtained lawfully as required by binding precedent.

**1. The False and Misleading Statements of "Training" and "Experience"**

As the Defendants concede, under *Franks* and its progeny, when evaluating a warrant that contains false statements and material omissions, the Court must evaluate the warrant *de novo* after removing the falsities and correcting the omissions. Doc. 9 at 8, 10; *United States v. Cardoza*, 713 F.3d 656, 658 (D.C. Cir. 2013); *United States v. Wells*, 223 F.3d 835, 838-840 (8th Cir. 2000); *United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009). Because this Court's review is *de novo*, the effect of the falsities and omissions is to be considered cumulatively. *United States v. Stanert*, 762 F.2d 775, 782 (9th Cir. 1985).

Although the content and order of the Defendants' arguments is difficult to decipher, the Defendants appear to make two arguments on this issue. First, the Defendants claim that the failure to inform the issuing judge of the woeful failure rates of MPD warrants based on "training" and "experience" in gun possession cases was "irrelevant" because "success rates are of limited

usefulness." Doc. 9 at 10-11.[7] This argument both fails to understand the Plaintiffs' allegations and is nonsensical.

The Plaintiffs alleged in the Complaint that MPD officers basing searches of homes on statements of "training" and "experience" after recovering a gun in the possession of a suspect fail to find a firearm in 91% of such home searches. Doc. 1 at ¶ 40. Moreover, according to the MPD's own records, MPD officers fail to find the kinds of documents and papers listed by Defendant Wright in over 94% of such searches (and likely higher). Doc. 1 at ¶ 41. The Plaintiffs need not, as the Defendants suggest, argue that these failure rates of 91% and 94%, as a matter of law, by themselves establish a lack of probable cause. Instead, the Plaintiffs' point is less categorical and dramatic. First, because it is the role of the neutral magistrate to evaluate probable cause based on the "totality of the circumstances," it is vital that the neutral magistrate is given reasonably accurate and complete information. By telling the judge that he "knew," Doc. 1-1 at 5, that he would find certain items based on the MPD's "training" and his "experience" that such items "are generally" found in criminals' homes while hiding from the judge that MPD officers do *not* find those items in an overwhelming majority of such searches in the District, Defendant Wright deprived the judge of relevant information that any reasonable person would want to know when making a decision based on the totality of the circumstances.

Presented with this information, a reasonable judge would be able to evaluate whether it was actually probable that those items would be found in the Plaintiffs' home and, presented with

---

[7] The Defendants cite for this proposition *Florida v. Harris*, 133 S. Ct. 1050 (2013), which they take completely out of context. The Supreme Court's discussion of the lack of reliability of the field performance of detector dogs is irrelevant on its face. Nothing in *Harris* suggests that examining what MPD officers actually find in home searches and comparing that to what they said in advance that they would find would not be relevant in testing those factual assertions. Indeed, the very goal of a warrant application is for an officer to convince a reasonably cautious person that those things will probably be found. *Harris* simply rejected a "strict evidentiary checklist" for probable cause, but it still encouraged, *id.* at 1058, adversarial empirical testing of police assertions. When an officer makes a factual claim based on something quantifiable and about which the officer and the MPD keep records, examining those records to see whether the factual claim is invalid or wildly exaggerated is obviously "relevant."

the actual experience of MPD officers from their own records, would question some of the myriad unstated claims and assumptions about the kinds of "persons involved in illegal activities" described by Defendant Wright. A reasonable judge would realize that the central factual claim on which the judge was being asked to authorize an intrusive home search—the experience of the officer—is not the actual experience of D.C. police. A judge need not conclude as a matter of law that a failure rate of over 90% automatically bars issuance of a warrant, but the presentation of that fact would give any judge enormous pause before issuing a warrant without any other particularized information about the home beyond the officer's generic factual assertions.

Thus, this case involves not just material information that should have been presented, but also withheld information that would have suggested to the judge the falsity of Defendant Wright's statements about the content of his "training" and "experience." By hiding this information, Defendant Wright was able to base a search entirely on a factual claim and then hide evidence from the neutral arbiter that would have called into question that key claim. This is information for the judge to consider, not for police to withhold.

Second, several pages later and in a different section of the Motion, the Defendants argue that the false statements and omissions are irrelevant "because it does not reflect on Officer Wright's (the affiant's) training and experience, because it does not negate the possibility of success, and because finding a gun on a property creates probable cause for finding additional contraband on the property." Doc. 9 at 15. None of these claims are supported by any explanation, citation, argument, or analysis.

It is difficult to understand what these arguments mean without any support. The first clause appears to suggest that the Defendants are either disputing the factual allegation in the Complaint about the content of Defendant Wright's training and experience (i.e. claiming that his

"training" and "experience" is somehow different from that of other experienced MPD officers), *see* Doc. 1 at ¶ 81-84, or asserting that the MPD, despite knowing that these home raids are woefully ineffective, actively misled Defendant Wright and "trained" him that such raids are actually effective. In any case, the Plaintiffs allege that Defendant Wright got the same training as the numerous other MPD officers who were trained to include such statements of "training" and "experience" in warrant applications when they have no information about a particular location despite knowing from their actual experience that the items they were seeking would not likely be found. Doc. 1 at ¶ 80-84.

More simply, the Defendants ignore what the MPD and dozens of its officers have sworn under oath repeatedly to Superior Court judges in other warrant applications. The Complaint alleges that Defendant Wright, the MPD, and the many dozens of experienced officers who have sought and obtained such "training" and "experience" based warrants know that the very same items that Defendant Wright claimed that he "knew" that he would find in the home are generally kept, if they even exist (which they typically do not because low-income illegal gun possessors rarely possess the accoutrements of gun ownership, Doc. 1 at ¶ 43), in a variety of places that are *not* the person's home because firearms in D.C. are routinely "passed and traded by individuals without documentation." Doc. 1 at ¶ 43. For this and other reasons, MPD officers seeking warrants after gun arrests have routinely and for several years sworn to numerous state court judges that their "training" and "experience" has taught them that guns and gun-related items are likely to be found *either* in the arrestee's home *or* in the home of "friends," *or* in the home of "relatives," *or* in the home of "associates," *or* in a "business" location controlled by the suspect, *or* in a variety of other places, such as "stash houses" or mobile vehicles to which the person has access. The examples of such sworn assertions of "training" and "experience" in publicly available Superior

Court cases are ubiquitous across MPD districts. *See, e.g.*, 2012-crw-3107; 2013-crw-510; 2013-crw-964; 2013-crw-2115; 2014-crw-494. Defendant Wright withheld this information from the judge in this case.

As the Defendants repeatedly argue in their Motion, *it was the purported truth of Defendant Wright's assertions* that gave rise to probable cause in the first place. Doc. 9 at 5-7. But the Plaintiffs allege that the content of that "training" and "experience" was deliberately and recklessly misrepresented to the issuing judge as part of a false web of broad assertions designed not to reveal the truth but to justify an intrusive search that lacked any specific evidence.[8] Reporting to a judge that, based on one's "training" and "experience," items will be found in the gun possessor's home while knowing that this "training" and "experience" teaches that "illegal gun possessors" in D.C. either do not have such items or commonly keep those same items in a variety of other places that are not the person's home, thus misleads the judge on the most critical issue related to probable cause. We are now even told by the Defendants that this statement of expertise—that this category of human beings keeps this laundry list of items at their own home—*is the reason that the warrant was valid*. If that integral assertion is untrue and incomplete, any justification for the warrant, even in the scary categorical world envisioned by the Defendants, disappears.

An application re-written to include all of these truthful assertions about firearms and related papers and materials routinely *not* being in a gun possessor's home would woefully lack probable cause to search 2400 3rd Street in particular. Had Defendant Wright sought, for example, to conduct a search in an apartment building but claimed that the evidence he sought was in either Apartment 102 or Apartment 205 or in Apartment 706 or in Apartment 508, he would clearly not have probable cause to search Apartment 102. *See, e.g., In re K.H.*, 14 A.3d 1087, 1092 (D.C.

---

[8] The same applies for the other factual allegations in the Complaint, including Defendant Wright's deliberate deception with respect to whether he was trained that individual bullets are often sold in the District. Doc. 1 at ¶ 44.

2011) (fleeing robber going into any one of four apartments did not give police probable cause to raid Apartment 3 even with indication that voices were heard in Apartment 3 discussing the police). In other words, to the extent that the items may be found at locations B, C, D, E, or F, it becomes less probable that the evidence is at location A. *See, e.g.*, *Rowland*, 145 F.3d at 1205. The actual "training" and "experience" of MPD officers that Defendant Wright withheld goes a long way toward explaining why the failure rates in non-evidence based home searches after gun arrests are so high.

The Defendants' next claim, that the high failure rate "does not negate the possibility of success," Doc. 9 at 15, is bizarre. The Fourth Amendment is not concerned with the mere "possibility" of turning up evidence of a crime; "the Founders did not fight a revolution," *Riley*, 134 S.Ct at 2491, 2494, to allow armed home searches seeking the mere "possibility" of criminal activity. The question in this case is whether the warrant application, fairly considered including all of the corrected false statements and material omissions, gives rise to *probable cause*. Because this question rests on whether specific facts warrant a reasonably cautious person in the belief that the listed criminal items will be found at the particular location, knowledge that those items are rarely found in such home searches (because the people in question either do no keep those items or keep them in other locations) undermines the reasonable belief that they will be found, even if it is "possible" that they might be found.

The final claim—the categorical claim that finding a gun on a person sitting on the front steps of a home grants automatic probable cause to search the home, Doc. 9 at 15—is meritless. The Defendants cannot muster a single citation to support it.[9]

[9] This argument also ignores Defendant Wright's claim on the face of the application that the firearm was found outside the property. That claim was false, but the fact that a person is sitting on the front steps of an acquaintance's house (a person who had never even been into the house before) does not give the police automatic probable cause, with no other information, to raid the home, even if the stop and search had been lawful.

**2. The False Statements Concerning the Events of October 27, 2012**

The warrant application also contained numerous false statements and material omissions that were designed to hide the misconduct of the Defendant police officers. These false statements and omissions are relevant to the Plaintiffs' claims in three ways: (1) As discussed in this Section, some of them are directly relevant to probable cause; (2) As discussed in Section I.C, they were designed to hide from the issuing judge the facts revealing that the warrant relied on illegally obtained evidence; and (3) As discussed in Section II, the false statements and omissions concealed separate violations of the Plaintiffs' constitutional rights.

At least two of the false statements and omissions were relevant to any objective consideration of probable cause. First, Defendant Wright represented to the issuing judge that officers were stationed at the house to prevent anything from being destroyed while he sought the warrant. Doc. 1-1 at 4. However, Defendant Wright omitted to tell the issuing judge that two officers (Defendant Wright himself as well as another officer) had *already* been inside the family's small home, searching it for 10 minutes, prior to writing the warrant application. Doc. 1 at ¶ 58. The fact that neither officer found anything unlawful in the home during 10 minutes of unlawful and unsupervised rummaging would have been relevant to any reasonable person's assessment of probable cause to believe that the home contained the long list of numerous items, firearms, and various accessories that Defendant Wright claimed are kept in the homes of "persons involved in illegal activities." Adding a statement to the warrant application that the small home had been searched by two MPD officers for at least 10 minutes with nothing unlawful found would, on *de novo* review, clearly result by itself in a warrant that failed to state probable cause, especially given that the warrant application already woefully failed to state any particularized probable cause. *See Hopkins*, 128 F. Supp. 2d at 7. The Defendants do not bother to address this allegation let alone

to argue that the warrant would have stated probable cause had the information been included. Any argument to dismiss this claim is thus both meritless and waived.

Second, after allowing the three men to go to the porch, Defendant Wright claimed that he saw a red jacket left behind. Among other misstatements and omissions, Defendant Wright falsely claimed that he told the men that he would keep the bottle of Hennessey sticking out of the jacket if they did not claim ownership of the jacket. In actuality, Defendant Wright threatened that he would smash the bottle of alcohol on the front steps if one of the men did not take the jacket. Doc. 1 at ¶ 51. At that point, Mr. Crossland told Defendant Wright to hand him the jacket because he did not want glass all over the front steps. Contrary to the assertions in the warrant application, Mr. Crossland did not claim ownership of the jacket. *Id.* Despite the fact that Defendant Wright believed Mr. Boatwright to own the jacket and despite the fact that Mr. Boatwright confessed in great detail to owning the jacket and its contents, in their Motion the Defendants defend the existence of probable cause to search the Plaintiffs' home using Defendant Wright's assertion that, at one point, Mr. Crossland claimed ownership of the jacket. Doc. 9 at 4, 9. The Defendants therefore concede that this "fact," if false, was relevant to establishing probable cause to search the home. Since it was false, it must be corrected and probable cause determined *de novo* without the assertion that Mr. Crossland had claimed ownership of the jacket. With that fact corrected, the already unreasonably weak basis for asserting that Mr. Crossland was a person "involved in illegal activities" would be destroyed.

Given the lack of probable cause on the face of the already existing application, it is clear that the warrant application would fail to establish probable cause if each of the material falsities and omissions discussed in this Section and in the Complaint were corrected.

### C. The Warrant Improperly Relied on Information Obtained in Unconstitutional and Illegal Searches and Seizures

**1. The Defendants Misunderstand the Law Applicable to the Plaintiffs' Claims**

It is well established that police officers cannot use the warrant process to purge the taint from otherwise illegally obtained evidence. *See Segura v. United States*, 468 U.S. 796, 814 (1984) ("None of the information on which the warrant was secured was derived from or related in any way to the initial [unlawful] entry into petitioners' apartment."); *Alderman v. United States*, 394 U.S. 165, 177 (1969) ("Nothing seen or found on the premises may legally form the basis for an arrest or search warrant…."). As the Supreme Court explained in *Murray v. United States*, 487 U.S. 533, 540 (1988):

> An officer with probable cause sufficient to obtain a search warrant would be foolish to enter the premises first in an unlawful manner. By doing so, he would risk suppression of all evidence on the premises, both seen and unseen, since his action would add to the normal burden of convincing a magistrate that there is probable cause the much more onerous burden of convincing a trial court that *no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it*. Nor would the officer without sufficient probable cause to obtain a search warrant have any added incentive to conduct an unlawful entry, since whatever he finds cannot be used to establish probable cause before a magistrate.

(citation omitted, emphasis added). The Court in *Murray* later added that the warrant would not have been valid "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id*. at 542. The D.C. Circuit has also made the same fundamental point:

> When an affidavit in support of a search warrant contains information which is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue.

*James v. United States*, 418 F.2d 1150, 1151 (D.C. Cir. 1969); *see also, e.g., United States v. Reilly*, 76 F.3d 1271, 1280 (2nd Cir. 1996) (declining to apply the good faith exception when the

"issuance of the warrant was itself premised on material obtained in a prior search that today's holding makes clear was illegal"); *United States v. Davis*, 430 F.3d 345, 358 n.4 (6th Cir. 2005) ("[W]e agree with the numerous other circuits that have held that the *Leon* good-faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure.").[10]

Therefore, the Defendants' conclusion that "the source of the evidence has no bearing on its usefulness in determining probable cause," Doc. 9 at 10, could not be more wrong. The Supreme Court and the D.C. Circuit have both held the opposite.

*Malley* holds that the *Leon* rule is the rule applied to civil cases: an officer will be liable for executing a warrant if the officer's reliance on the warrant is not objectively reasonable. 475 U.S. at 345-46. As the cases make clear, it is not objectively reasonable for an officer to rely on a warrant that depends on illegally seized evidence. Here, the Plaintiffs allege that Defendant Wright deliberately lied to and hid information from the issuing judge to cover up that he had performed illegal seizures and searches to obtain a warrant that no judge, following binding precedent, could have issued. Reliance on that warrant was not reasonable.

In arguing otherwise, the Defendants misunderstand the Plaintiffs' claim with respect to the illegally obtained evidence. While it is true that the use at trial of illegally obtained evidence would "work no new Fourth Amendment wrong," *United States v. Calandra*, 414 U.S. 338, 354 (1974), the Plaintiffs are not vicariously asserting a claim on behalf of Mr. Crossland or Mr. Boatwright for some separate wrong to them. The claim of the Plaintiffs is that the Constitution prohibits police from obtaining a search warrant using illegally obtained evidence and that *they*

[10] In *Reilly*, Judge Calabresi also explained: "It bears emphasis … that the good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all the known facts. Good faith is not a blanket excuse for any police behavior. A warrant is not a general hunting license, nor is it a mantle of omnipotence, which cloaks its holders in the King's power to "do no wrong." And perhaps most important, it is not an excuse if the police are not frank with the magistrate in proceedings to obtain the warrant—proceedings that are typically *ex parte*." 76 F.3d at 1273.

*themselves had their Fourth Amendment rights violated* by the issuance of an invalid search warrant that never should have issued. The remedy when that happens is to evaluate the search warrant with the illegally obtained fruits removed from the application.

The federal courts have created that rule because the contrary situation would be absurd: Police could enter a family's property discretely without a warrant, use anything they saw in the home to go and apply for a warrant, and then raid the home pursuant to the warrant, seizing any evidence of a crime. Police could even lie about the facts that rendered the initial search unlawful to prevent the judicial officer from ever having the chance to consider those facts, thereby fraudulently obtaining a warrant that never would have issued. On the Defendants' theory, the family would have no civil claim for the warrant execution*, even for the harm that they themselves suffered in the raid and search of their home*, due to a warrant that would never have issued but for the lies of police officers covering up their illegal conduct. Police could thus purge any unlawful actions by including them in a subsequent warrant application. Thankfully, courts do not allow police to do that, instead requiring that warrant applications be based on truthful information that was learned by the police in a lawful manner. *See, e.g.*, *Reilly*, 76 F.3d at 1280 (2d Cir. 1996) ("For the good faith exception to apply, the police must reasonably believe that the warrant was based on a valid application of the law to the known facts. In the instant matter, the officers failed to give these facts to the magistrate. The officers presented … a description that was almost calculated to mislead. Moreover, the officers failed to give Judge Barrett information as to their behavior, on the basis of which he could determine whether even this scant description was itself the fruit of an illegal search that lacked the elements of good faith."). Warrants predicated on unlawfully obtained information are invalid, and police officers know that.

The cases cited by the Defendants have nothing to do with that principle. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 134 (1978).[11] Instead, they concern standing to assert Fourth Amendment violations in criminal cases. In those cases, criminal defendants attempted to claim that their Fourth Amendment rights were violated by an unlawful search of someone else. The Court held that those defendants did not have standing to assert the privacy rights of another person. The search warrant context is different. Here, the Plaintiffs clearly have standing because *their* home was raided, and their contention is that the warrant never should have issued. The Plaintiffs undoubtedly have a legitimate expectation of privacy in their residence.

Even the Defendants concede that a police officer would be liable if the officer were to search a home without a warrant. They utterly fail to explain why the result should be different when an officer with no right to obtain a valid warrant tricks a magistrate into issuing a warrant by fraudulently describing the events and withholding the information necessary to determine that the warrant application was based on illegal conduct.

Using the warrant process to cleanse unlawful searches would be an abuse of the courts. When people subject to a search and violent home raid on the basis of an improperly issued and fraudulently obtained warrant bring suit, they clearly have standing to assert that the warrant should not have issued but for the misconduct of the Defendants.

**2. The Defendants Concede the Illegality of the Seizures and Searches**

The Plaintiffs have alleged, and discuss in detail below, several unlawful seizures and searches from which Defendant Wright obtained the information in the warrant application. Because the Plaintiffs allege facts that, if true, would establish unconstitutional seizures and

[11] Indeed, in *Brown v. United States*, 411 U.S. 223 (1973), the actual owner of the location had successfully challenged the defective search warrant, but the people who did not own the premises could not assert the owner's rights because a person cannot assert Fourth Amendment claim unless his or her own legitimate expectation of privacy was violated by the government action.

searches, and because the Defendants do not defend in their Motion the actions of the officers on the merits, the fruits of those unconstitutional seizures and searches must be excised from the warrant application and probable cause determined without reference to them.

### II. The Defendants' Illegal Seizures and Searches

The Complaint alleges a number of unconstitutional and illegal police actions, beginning from the moment that Defendant Wright approached the three men.

#### A. The Unlawful *Terry* Stop of Mr. Crossland

The warrant application describes the interaction as beginning with Defendant Wright and Officer Haselden asking the men if they lived at the home and asking for identification. It omits to describe how Defendants Wright, Haselden, and a third officer not mentioned in the warrant application actually exited the police vehicle, approached the men, and immediately ordered them to stay where they were. Doc. 1 at ¶ 50. This first seizure was not based on any reasonable suspicion as required by *Terry v. Ohio*, 392 U.S. 1 (1968). At that point, Defendant Wright had no basis to conduct a valid *Terry* stop. The only asserted basis for the seizure was that he observed, while driving, a "hand rolled cigar" and a Styrofoam cup. That is plainly insufficient. *See United States v. Jones*, 584 F.3d 1083, 1086 (D.C. Cir. 2009) (explaining that "there was not a basis for a *Terry* stop" when officers observed the suspect holding a "large white styrofoam cup" amidst a party-like atmosphere on the street and when the crowd dispersed on seeing police). Despite his claim that he "believed" these items to contain marijuana and alcohol respectively, there is not a single objective fact offered by Defendant Wright (or by the Defendants' Motion, which ignores this issue) that could justify reasonable suspicion of criminal activity. Free citizens are allowed to smoke cigars and to drink from Styrofoam cups without being seized by agents of the government, especially if they are sitting on private property. *Id.* at 1086-87 ("There was not even evidence

there was anything in the cup appellant was holding, much less the color or smell of its contents; the cup and the brown bag were opaque….”).

Indeed, neither drinking alcohol on one’s front steps nor smoking synthetic marijuana, neither of which Defendant Wright had reasonable suspicion to suspect the men were doing before seizing them, were illegal at all. *See infra* note 12.

Moreover, Mr. Crossland was not even doing either of those things, as even the officers explained that Mr. Crutchfield was the one smoking the cigar and Mr. Boatwright was the one with the Styrofoam cup “next to his left foot.” Doc. 1-1 at 3. In any case, the Defendants’ Motion does not mention, much less argue for the dismissal, of this unconstitutional seizure as set forth in Count Seven of the Complaint. Doc. 1 at ¶ 98. The Motion must be denied.

**B. The Unlawful Search of Mr. Crossland**

Plaintiff Terrence Crossland alleges that he was illegally searched by Defendant Wright and the other officers without consent and without probable cause. Doc. 1 at ¶50, 98. This search of his person and pockets occurred immediately after the Defendants had exited the police car and ordered the men to stay where they were. Defendant Wright claimed that his initial search of Mr. Crossland was based on Mr. Crossland’s supposed consent, Doc. 1-1 at 3, which Mr. Crossland never gave. Doc. 1 at ¶ 50. Because the search of his person lacked consent and probable cause, it was illegal, and the Fourth Amendment claim based on this unlawful search must not be dismissed. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (“It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable....”). In any case, the Defendants do not address this claim in their Motion and therefore waive any attempt to dismiss it.

**C. The Trespass Inside the Plaintiffs’ Yard to Detain and Search Mr. Crossland**

The Plaintiffs allege that Defendant Wright and the other officers unlawfully entered their property to begin searching Mr. Crossland and his acquaintances. *See, e.g.*, *United States v. Perea-Rey*, 680 F.3d 1179, 1188-89 (9th Cir. 2012) ("[B]y trespassing on the curtilage and detaining Perea–Rey, Agent Trujillo violated Perea–Rey's Fourth Amendment rights."). The Defendants do not address this claim let alone explain with any arguments or citations how it could be that Defendant Wright had permission to enter private property for the purpose of searching the men without consent and without a warrant. This claim must not be dismissed. Doc. 1 at ¶ 49-54, 94.

**D. The Unlawful Arrest of Terrence Crossland**

Plaintiff Terrence Crossland alleges that he was unlawfully arrested without probable cause to believe that he had committed any offense. As a preliminary matter, the Defendants do not defend Mr. Crossland's arrest on his own property for possession of an open container of alcohol for the Styrofoam cup that had been sitting next to Mr. Boatwright's left foot.[12] The Defendants' sole argument is that Mr. Crossland's arrest for "Carrying a Pistol," Doc. 1-1 at 3, is supported by probable cause because he "flatly stated that he owned the jacket." Doc. 9 at 11. Even assuming that Mr. Crossland was arrested for "Carrying a Pistol," a crime with which he was never charged and for which he was never told he was being arrested, this argument clearly fails for two reasons.

First, as alleged in the Complaint, Mr. Crossland never stated that he owned the jacket. Doc. 1 at ¶ 51. That false statement was included in the warrant application by Defendant Wright, but the Complaint alleges that Mr. Crossland simply asked Defendant Wright to give him the jacket to avoid Defendant Wright carrying out his threat to smash the glass bottle on his front steps if no

[12] District law does not criminalize the possession of alcohol on private property, such as the steps leading up to one's home. D.C. Code § 25-1001. Moreover, although Defendant Wright claimed in the warrant application that possession of synthetic marijuana was illegal and arrested Mr. Crutchfield on that theory, the District did not criminalize possession of synthetic marijuana until several months after the incident. *See* Omnibus Criminal Code Amendments Act of 2012 (Bill 19-645).

one took the jacket from him. *Id.* For this reason alone, the false arrest claim must not be dismissed because the Defendants' only argument is to dispute the facts alleged in the Complaint.

Moreover, even Defendant Wright believed at the time, as he repeatedly suggested in his warrant application, that the jacket belonged to Mr. Boatwright because Mr. Boatwright was the only one not wearing the jacket and because the jacket was "next to" Mr. Boatwright. Doc 1-1 at 3. The decision by officers to arrest all three men for possession of the gun and the Styrofoam cup without having any evidence or themselves even believing that Mr. Crossland possessed the gun is precisely the kind of "round 'em all up" policing that the Fourth Amendment prohibits. The Defendants had absolutely no evidence that Mr. Crossland had committed the elements of any gun offense under D.C. law. *See Wesby v. District of Columbia,* 2014 WL 4290316 (D.C. Cir. Sept. 2, 2014) ("The law in this jurisdiction has been well established for decades that probable cause to arrest requires at least some evidence that the arrestee's conduct meets each of the necessary elements of the offense that the officers believe supports arrest."). The three days that Mr. Crossland spent in jail, Doc. 1 at ¶ 77, before appearing in court, where the government decided not to pursue charges against him, were the direct result of the Defendants' illegal arrest.[13]

Second, the arrest was based on Defendant Wright's illegal behavior. After illegally seizing and searching the men and finding nothing, Defendant Wright told them to go sit on the porch. Doc. 1 at ¶ 20. As Defendant Wright acknowledged at the time, none of the men had done anything illegal at that point. After they walked through the yard toward the porch on Defendant Wright's orders, Defendant Wright claimed to observe a red jacket left behind from "next to" where Mr. Boatwright (the only man not wearing a jacket) had been sitting. Defendant Wright

[13] Moreover, even if there were a shred of evidence that Mr. Crossland was "carrying a pistol"—which he never knew about and most certainly never possessed—criminalizing the possessing a firearm on one's own property would be unconstitutional. *Palmer v. District of Columbia*., 2014 WL 3702854 (D.D.C. July 24, 2014) (holding that the District's total ban on firearm possession is clearly incompatible with the Second Amendment).

misleadingly suggested that the jacket was not on the Plaintiffs' property by telling the issuing judge that it was "outside the fence line" even though the jacket was lying on the steps that are part of the property. *Id.* at ¶ 62. Defendant Wright then threatened to smash the bottle of Hennessey protruding from the jacket if the men did not take the jacket back with them. *Id.* at ¶ 51.

After Mr. Crossland asked for his friend's jacket and asked the Officer not to break the bottle on his steps, Defendant Wright simply unzipped the pockets of the jacket and began reaching his hand into the pockets to search them, finding Mr. Boatwright's firearm. *Id.* At that moment, Defendant Wright was standing on the Plaintiffs' property unlawfully without permission and searching through a piece of property that he had picked up off the ground on the Plaintiffs' land—an object that Mr. Crossland had just asked him to hand over. According to Defendant Wright, he was doing so out of some kind of concern that the jacket had been "abandoned." This is a facially unreasonable assertion given that Defendant Wright himself believed the jacket to be the property of the man who he had just searched. Even according to the Defendants' Motion, the "abandonment" theory is nonsensical because the Defendants claim that Mr. Crossland had just claimed ownership of the jacket. How Defendant Wright could possibly lawfully consider the jacket as abandoned on private land when the resident of a home claims the property found on his land to be his was never explained.[14]

The Defendants' theory also misconstrues the doctrine of abandonment, which the Defendants do not bother to address or to support with any authority. *See United States v. Thomas*, 864 F.2d 843, 846 (D.C. Cir. 1989) (emphasizing that abandonment hinges on an objective assessment of intent and that throwing a bag away in a "public place" in which a person had no

[14] The Defendants cannot have it both ways. They now claim that officers could search the entire home because Mr. Crossland initially claimed to own the jacket. But if true, that justification by Defendant Wright would have invalidated any rightful claim to search the jacket as "abandoned" property.

reasonable expectation of privacy constituted abandonment); *United States v. Wider*, 951 F.2d 1283, 1285 (D.C. Cir. 1991) (same); *Abel v. United States*, 362 U.S. 217, 241 (1960) (noting that property was abandoned when it was "thrown away."). Leaving a jacket in a friend's yard on private property while walking up to the friend's porch to hang out just feet away at the direction of a police officer is simply not sufficient for any objective person to consider that property "abandoned."

Finally, Mr. Boatwright had been separated from the jacket that was "next to" him only because of the illegal seizure and search by the Defendants, who unlawfully brought the men away from the jacket and toward the porch to search them. The Defendants cite no case allowing police to themselves separate a person from his property and then search that property on the theory that it was abandoned. In sum, then, Defendant Wright unlawfully stopped, seized, and searched the men. He brought them inside the yard of the private property illegally without permission for the purpose of searching the men. He then searched without permission or justification through a red jacket that he found lying on the property that had been left behind only because he had grabbed the men and taken them away from the jacket and further into the yard. Because the Defendants make no arguments and cite no caselaw to justify this theory of "abandonment" mentioned in the warrant application, any reliance on it should be rejected. For all of these reasons, the otherwise unjustified arrest of Mr. Crossland, just like the issuance of the warrant, was based on a series of unlawful and unconstitutional actions.

**E. The Warrantless Search of the Home**

As Ms. Lane watched the Defendants illegally searching her grandson on her front lawn, she came onto her porch and began taking photos to document the placement of police officers and their detention of Mr. Crossland. Doc. 1 at ¶ 52. After the men were arrested and Ms. Lane

had spoken to several other officers, Defendant Wright came up to the front porch and told Ms. Lane that he would like to search her home. She asked him if he had a search warrant. He told her that he did not have a warrant, but then told her that he was "going in anyway." Defendant Wright and another officer proceeded to go into the home and search it without a warrant for at least 10 minutes. As Ms. Lane attempted to follow Defendant Wright into the home, she was grabbed forcefully by another Defendant and held outside the door. Doc. 1 at ¶ 54-56.

The Defendants briefly argue that entering the home without a warrant was justified and cite only *Maryland v. Buie,* 494 U.S. 325, 327 (1990). According to the Defendants, *Buie* can be read categorically to allow a warrantless "protective sweep" of any home outside of which a person is arrested with a firearm. This is so because the officers "reasonably believed" that there "may be other guns on the property." Doc. 9 at 14. On top of that, because Ms. Lane came to watch and document the arrest of her grandson, the Defendants now argue that it was reasonable to believe that more people would have "access" to the weapons that they "reasonably believed" would be inside the home.[15] This argument flies in the face of longstanding precedent and basic reason.

Putting aside that the possibility that the home contained additional "weapons" was entirely speculative,[16] that the Defendants possessed no probable cause that Mr. Crossland had committed a crime, and that the warrantless entry was based on the previous illegal behavior of the Defendants, nothing in *Buie* gives police officers the right to enter and search a home anytime they make a warrantless arrest for gun possession outside the home.

[15] This unexplained assertion is bizarre. The Defendants do not explain why the emergence of a 71-year-old woman from a home would render it any more likely that armed and dangerous people with access to weapons were in the home than if no one had emerged from the home. If anything, the emergence of someone from the home to watch an arrest could make it *less* likely that anyone else would be in the home.

[16] As discussed in depth above, the belief that the home contained other weapons was purely speculative. The Defendants knew that searching the homes of gun possession arrestees in such circumstances fails to yields another firearm in over 91% of all searches. Moreover, the Defendants themselves believed that the gun belonged to and was possessed by Mr. Boatwright.

*Buie* dealt merely with procedures while police are "effecting the arrest of a suspect in his home" and are acting "pursuant to a warrant." *Id.* at 327. As the Court noted, the existence of an arrest warrant already gave officers "the right, based on the authority of the arrest warrant, to search anywhere in the house that Buie might have been found." *Id.* at 330. The Court made clear that the case concerned what to do when police *were already validly in a home pursuant to a warrant* to make an "in-home arrest." *Id.* at 330, 333 (noting that the nature of being inside a suspect's home means that "[a]n ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.").[17]

The Defendants cite no case permitting police to enter a home *after* safely accomplishing a warrantless arrest outside a home. Such a significant claim—one that shakes the entire foundation of *Buie*'s "in-home" arrest warrant rule—surely requires some argument or citation.

The Defendants instead ignore longstanding precedent. As the Supreme Court has explained: "These cases make it clear beyond any question that a lawful pre-*Chimel* arrest of a suspect outside his house could never by itself justify a warrantless search inside the house." *Coolidge v. New Hampshire*, 403 U.S. 443, 456 (1971). The Court has further held:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York*, 445 U.S. 573, 590 (1980); *Rodriguez*, 497 U.S. at 191 ("The Court has tolerated departures from the warrant requirement only when an exigency makes a warrantless

[17] Moreover, even *Buie* recognized that when a valid warrant exists and an in-home arrest is made, the "protective sweep" can last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36. Here, none of the men were arrested inside the home. According to Defendant Wright, they had been taken from "outside the fence line" and brought into the yard for the purposes of searching them. Having arrested, handcuffed, and removed the three men to police vehicles, there was no need for Defendant Wright to walk back to the house and enter the home having already accomplished the arrests. Finally, the "cursory inspection" for other dangerous people authorized by *Buie* could in no way have authorized a 10-minute search by two officers of the family's small home.

search imperative to the safety of the police and of the community.”). This case thus falls squarely under well-established Fourth Amendment principles that “absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within.” *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). There is no contention that exigent circumstances existed here. *See United States v. Ford*, 56 F.3d 265, 271 (D.C. Cir. 1995) (holding that no exigent circumstances existed because “delaying the course of the officers’ investigation in this case clearly would not have endangered their lives or the lives of others.”).

Although the Defendants do not cite it, the D.C. Circuit has applied *Buie* to allow a limited protective sweep when U.S. Marshals and police executed a valid arrest warrant on a suspect immediately outside the open door of his apartment in an internal hallway of an apartment building with the suspect’s door still ajar. *United States v. Henry*, 48 F.3d 1282, 1283 (D.C. Cir. 1995). In *Henry*, the court held that specific facts justified the need for a limited “security check” of the open apartment because the arrest with a warrant occurred “just outside the open door” and because an informant “had advised officers that Henry would have weapons and that Henry’s ‘boys’ or ‘counterparts’ (as alternatively described by the informant) might be with him.” *Id.* at 1283-84.

Therefore, even were this Court to decide to expand the *Buie* “in-home arrest” pursuant to a valid warrant rule to warrantless arrests outside the home in a yard, the *Buie* rule still requires specific justifications: A “protective sweep” is justified in “an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.” 494 U.S. at 337. Here, *after* the three men had been successfully arrested, several officers *walked back up* to the porch and asked to speak to Ms. Lane inside her home. Doc. 1 at ¶ 54. Asking an elderly woman for

permission to speak with her inside her home is not the behavior of officers who fear for their ability to accomplish their valid purpose of an arrest because of some identifiable, objective reason to believe that someone dangerous and armed lurked inside the house prepared to attack them. Ms. Lane agreed to speak to them outside the home, and it was only *after* that conversation with those officers that Defendant Wright himself walked up to her and told her that he wanted to "search" her home. Doc. 1 at ¶ 55. There was not a single piece of information suggesting that anyone else was in the home, let alone that the person would be dangerous. *Ford*, 56 F.3d 265 (rejecting existence of articulable facts for a protective sweep based only on a suspect's previous dangerous arrests and current warrant for homicide); *United States v. Pixley*, 7 F. Supp. 2d 52, 54 (D.D.C. 1998) (holding a protective sweep unconstitutional after an arrest warrant was executed for a homicide because articulable facts concerning the person's past history of dangerous crime were insufficient and because the arrestees had already been secured). There was simply nothing about the situation to give rise to articulable specific facts to believe, well after an arrest was accomplished in the yard, that someone dangerous lay behind a 71-year-old grandmother with a digital camera.[18]

### F. The Unlawful Seizure of Ms. Lane

During and after the warrantless search of the home, 71-year-old Ms. Lane was physically restrained by the Defendants and prevented from going into her home, even to use the bathroom, for approximately six hours. She was kept outside despite the fact that it was cold in late October 2012, several days before a large snow storm shut down the District of Columbia.

[18] A 2013 Office of Police Complaints report criticized the MPD for allowing a pattern of unconstitutional and unjustified warrantless entries by its officers into private homes. The report concluded that the illegal entries may have been the result, at least in part, of the MPD "not providing its members with adequate guidance or training on what constitutes an exigent situation permitting warrantless entry into a private residence." Warrantless Entries Into Private Homes By MPD Officers (June 2013), *available at* http://policecomplaints.dc.gov/publication/warrantless-entries-private-homes-mpd-officers.

The Defendants claim that this seizure was reasonable under *Michigan v. Summers,* 452 U.S. 692, 702-03 (1981). As a preliminary matter, for all of the reasons described above, including the illegal searches and seizures of Mr. Crossland and the lack of justification to effectuate a warrantless entry into Ms. Lane's home, the physical seizure and detention of Ms. Lane was unlawful. As the Defendants concede, the legality of the seizure and detention of Ms. Lane is dependent on the legality of Defendants' conduct outside the home and the validity of any request for a warrant. If the basis for seeking to search the home (and, therefore, the basis for detaining Ms. Lane) was unlawful and insufficient, the parties agree that the detention of Ms. Lane was unlawful. The Court need not reach, therefore, whether the treatment of Ms. Lane was reasonable had there been no predicate police misconduct and had officers possessed a valid basis to order her detention outside the home.

*Summers*, nonetheless, does not support the Defendants' conduct. The Court in *Summers* carefully limited its holding: "for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705. *Summers* claimed that it was of "prime importance" that the detention occurred only "after" a finding of probable cause had been made, 452 U.S. at 701, and that the detention occurred inside the home.

Even if *Summers* applied, detentions under *Summers*, as with any other kind of Fourth Amendment seizure or use of force, must be reasonable. Keeping an unarmed elderly woman outside her home in late October, therefore preventing her from using the bathroom and from obtaining minimally comfortable seating, was not reasonable given the circumstances. *See, e.g., Heitschmidt v. City of Houston*, 161 F.3d 834, 837–38 (5th Cir.1998) (holding that handcuffing and denying a plaintiff bathroom breaks during the search of his residence was not within the scope

of a permissible detention under *Summers*); *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994) ("A detention conducted in connection with a search may be unreasonable if it is unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy. Detentions, particularly lengthy detentions, of the elderly, or of children, or of individuals suffering from a serious illness or disability raise additional concerns."). The Defendants need not have subjected Ms. Lane to the painful cold weather, lack of bathroom, and public humiliation of a police escort on her front porch for hours. Any reasonable officer who possessed probable cause to secure the home would have allowed Ms. Lane to sit comfortably inside the home, even if she had to be observed to ensure that she did not destroy the evidence purportedly being sought.

**G. The Destruction of Evidence from Ms. Lane's Digital Camera**

The Defendants do not address let alone move to dismiss the claim that they violated Ms. Lane's Fourth Amendment rights by examining and deleting images of police misconduct from her digital camera. Doc. 1. at ¶7, 52, 73, 100. Because the Defendants do not make any arguments concerning this claim, any request to have it dismissed in this posture is waived.

**H. The Seizure and Retention of Mr. Crossland's Cellular Phone**

The Defendants do not address, and therefore waive, any request to dismiss the claim that they violated Mr. Crossland's Fourth and Fifth Amendment rights by taking and retaining without any legal process Mr. Crossland's cellular phone for nearly two years after the arrest in this case, despite requests that the phone be returned and despite no legal authority to accomplish the taking of his property. Doc. 1. at ¶25, 78, 98. *See, e.g., Fuentes v. Shevin*, 407 U.S. 67, 84-85 (1972) ("[I]t is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment.").

**I. The Conduct of the Defendants Shocks the Conscience**

The Plaintiffs also alleged, Doc. 1 at ¶ 68-74, 100, that the repeated and deliberate violations of their rights, including the unlawful entry onto their property; the seizures and searches of Mr. Crossland; the warrantless entry into the home after consent was refused; the six-hour detention of the elderly Ms. Lane outside the home; the deletion of photographs of police misconduct from Ms. Lane's digital camera; the refusal to show the family the warrant; the deliberate holding of the front gate onto Ms. Crossland's foot even after she complained that it was painful; and Defendant Wright's threats and taunts that he would make the family homeless by forcing them out of the home that Ms. Lane had lived in since 1975 if he were ever called back to their house "shocked the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). This flagrant, intentional, and repeated conduct was deliberately "intended to injure in some way unjustifiable by any government interest." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). Because the Defendants do not mention or move to dismiss this claim, any argument to dismiss it in this posture is waived.

Ms. Crossland's desperate attempt to call 911 to report the actions of the Defendants in this case, Doc. 1 at ¶ 69, reflects the bewilderment and panic that had set in on the family after enduring over six hours of repeated and deliberate physical and emotional humiliations.

**III. Municipal Liability**

In Count Four of the Complaint, *see* Doc. 1 at ¶91-92, the Plaintiffs allege that the District is liable for the constitutional violations that they suffered in Counts One and Two of the Complaint because of the MPD's failure properly to train and supervise its officers concerning the planning and execution of home search warrants, including its policies and practices to train and supervise MPD officers to include and rely on in warrant applications statements of "training" and "experience" that are insufficient, incomplete, unsubstantiated by the MPD's own data,

contradictory, and knowingly false and misleading. As a result of the content of MPD's training, which Defendant Wright cited in his application, as well as the failure properly to supervise its officers, the MPD created a policy, pattern, and practice of similar constitutional violations in the planning and execution of at least 56 gun possession "training" and "experience" based home raids in the one-year period surrounding the search of the Plaintiffs' home. *Id.* at ¶¶ 79-84.

The only argument made by the District of Columbia concerning the municipal liability claim under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), is that the Plaintiffs have not alleged an underlying constitutional violation with respect to the validity of the warrant in this case. Doc. 9 at 16-17. Because the Defendants make no other argument in their Motion and because the Plaintiffs have, as explained above, sufficiently alleged that the warrant was invalid because of its reliance on insufficient, false, and misleading statements of "training" and "experience," the Defendant District of Columbia's Motion with respect to the Plaintiffs' municipal training and supervision claims must be denied.

**IV. Conclusion**

For the reasons stated above, each of the Plaintiffs' claims in the Complaint clearly contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Defendants' Motion should be denied.

Respectfully submitted,

*/s/ Alec Karakatsanis*

Alec Karakatsanis (D.C. Bar No. 999294)
Equal Justice Under Law
916 G Street, NW #701
Washington, D.C. 20001
(202) 681-2409
alec@equaljusticeunderlaw.org

*Attorney for the Plaintiffs*