**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ELLA LANE, *et al.*,

          Plaintiffs,

      v.

DISTRICT OF COLUMBIA, *et al.*,

          Defendants.

Civil Action No. 14-1316 (RDM)

## MEMORANDUM OPINION AND ORDER

This is one of a series of cases pending before this Court seeking damages from the

Metropolitan Police Department ("MPD") and individual officers for allegedly searching private

homes without probable cause.[1]  The common thread in each case is an attack on the MPD's

practice of seeking search warrants based on an averment that the investigating officer "knows"

based on his or her "training and experience" that individuals suspected of certain crimes—

typically involving the illegal distribution of drugs or unlawful possession of a gun—are likely to

have evidence of their unlawful activity in their homes.  In each case, the plaintiff alleges that the

officer who submitted the affidavit in support of the warrant knew, or should have known, that

just the opposite is true—that, in fact, people who are arrested outside their homes on drug or

gun charges rarely keep evidence of their illegal activity in their homes.

Although all of these cases rely on this common theme, each is also unique.  Some

involve drug arrests, some guns, and some both.  Some involve little or no evidence of a nexus to

---

[1]  *Queen v. District of Columbia*, 15-cv-01518; *Davis v. District of Columbia,* 15- cv-01497; *S.H. v. District of Columbia* 14-cv-1317; *Pitts v. District of Columbia,* 14-cv-1319, *Lane v. District of Columbia,* 14-cv-1316; *A.B. v. District of Columbia*, No. 15-cv-1490.

the residence searched, while others involve a more substantial connection.  And most involve additional allegations of police misconduct, separate from the alleged deficiencies in the warrant or supporting affidavit.  As a result, just as a magistrate must "make . . . practical, common-sense decision[s] [based on] all of the circumstances set forth in the affidavit," *Illinois v. Gates*, 462 U.S. 213, 238 (1983), the Court must independently evaluate the particular circumstances presented in each of these cases.

The present dispute began when the investigating officer found a handgun in the pocket of a jacket left by one of three men on the top step of a walkway leading from the street to the house where one of the three men (Terrence Crossland) lived with his mother (Adrian Crossland) and grandmother (Ella Lane).  That discovery led to Terrance Crossland's arrest (along with the other two men), a brief warrantless search of the Crossland/Lane home, the subsequent issuance of a warrant to search the home for various items relating to the ownership and use of firearms, and a second, more extensive search of the home.  No evidence of illegality was found in either search of the home, and the MPD ultimately declined to bring any charges against Terrance Crossland.  Following these events, Terrance Crossland, Adrian Crossland and Ella Lane brought this action, challenging the legality of virtually all of the actions of the police officers that day, from their initial interaction with Terrance Crossland on the steps outside his home through their second search of the Crossland/Lane home later that evening.  Their complaint names the officer who submitted the affidavit in support of the search warrant, five other named officers, an unspecified number of unnamed officers, and the MPD itself.

The MPD, the District, and the individual officers (collectively, the "District") have moved to dismiss the complaint, principally on the grounds that the officers' conduct was lawful; that, in any event, the individual officers are protected by qualified immunity; and that the

plaintiffs have failed to allege a claim against the MPD under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  Dkt. 9.  For the reasons explained below, the Court will **GRANT** the motion in part and **DENY** it in part.

## I.  BACKGROUND

For purposes of the defendants' motion to dismiss, the following allegations from the complaint are taken as true.[2]  *See, e.g.*, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).  In addition, the search warrant and supporting affidavit are attached to the complaint and are thus properly before the Court for purposes of resolving the defendants' motion.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) (explaining that when considering a motion to dismiss, a court may "consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice.").

According to the complaint, MPD officers John Wright and Timothy Haselden, along with an unnamed third officer, were patrolling in a cruiser in northeast Washington, D.C., on October 27, 2012, when they saw three men sitting on the steps outside the Crossland/Lane home.  Compl. ¶ 16; Dkt. 1-1 at 2.  Wright saw one of them smoking a "hand-rolled cigar," which he believed to be marijuana.  Compl. ¶ 17.  He "also observed a [s]tyrofoam cup, which he [later] asserted 'is often used by people when they drink alcohol.'"  *Id.* (quoting Dkt. 1-1 at 3). He pulled over to question the men.  *Id.*

---

[2]  The Court cites the initial complaint, rather than the amended complaint, Dkt. 25, because the pending motion to dismiss was directed at that version of the complaint, and the amended complaint merely added the names of some of the defendants without altering any of the substantive allegations at issue.

On the steps were Darrell Boatwright, Terrance Crossland, and Benjamin Crutchfield. Dkt. 1-1 at 2. Crutchfield was smoking the "cigar." *Id.* Crossland and Crutchfield were both wearing jackets; Boatwright was not.[3] *Id.* The styrofoam cup was next to Boatwright's left foot. *Id.* at 3. After exiting the cruiser, Wright "immediately . . . ordered the men to stay where they were." Compl. ¶ 50. Although Wright later averred in an application submitted for a warrant to search the Crossland/Lane home that the three men then consented to a search, *see* Dkt. 1-1 at 3, the complaint disputes that assertion, alleging that the officers "immediately searched the men," a search that "include[ed] putting their hands into the[ir] pockets." Compl. ¶ 50. That search did not yield any contraband from any of the men. *Id.* ¶ 51. Wright then asked the three men for identification and asked whether they lived at the house. *Id.* ¶ 18. Crossland said he did, and he handed over his identification, which listed an address matching the house. *Id.* Wright also asked Crutchfield to put out the "cigar." *Id.* Crutchfield complied but explained that he was smoking "Scoobie Snacks," a synthetic marijuana, and not "real weed." *Id.*; Dkt. 1-1 at 3. Boatwright and Crutchfield also provided their identification. Dkt. 1-1 at 3. Having found nothing warranting further action, Wright granted the three men permission to move to the front porch. Compl. ¶¶ 20, 51.

According to Wright's affidavit, Boatwright "neglect[ed] to pick up [a] red jacket that was next to him" when the men got up to move. Compl. ¶ 51; Dkt. 1-1 at 3. Wright claims he then told the group that they had left the jacket behind, but "[t]he three collectively denied ownership of the jacket." Dkt. 1-1 at 3. A bottle of Hennessy (a cognac) was apparently protruding from one of the pockets of the jacket, and, according to Wright, he told the three men that he would keep it if none of the men claimed the jacket. *Id.* At that point, according to

---

[3] All references herein to "Crossland," without including a first name, are to Terrence Crossland.

Wright's affidavit, Crossland responded, "yeah man, it's my jacket[;] I got it." *Id.* The affidavit

adds, however, that Wright "found this to be strange because [Crossland] was already wearing a

jacket and . . . Boatwright was the only individual in the group to not have a jacket on." *Id.*

Wright, accordingly, told Boatwright to sit back down. *Id.* Wright then searched the red jacket

and found a handgun. *Id.* at 3–4. Wright called for backup after finding the gun, and five more

officers arrived at the scene. *Id.* at 4. They placed all three men under arrest for carrying a pistol

and possessing an open container of alcohol. *Id.* This latter charge was based on the officers'

belief that the liquid in the styrofoam cup smelled like Hennessy.[4] Crutchfield was also charged

with "Possession of Other in reference to the synthetic marijuana." *Id.*

The complaint tells a different story than the affidavit, and it is that story that is

controlling for purposes of the pending motion to dismiss. *See Hishon*, 467 U.S. at 73. Instead

of Wright threatening to keep the bottle of Hennessy, the complaint alleges that Wright

"threatened to smash the glass alcohol bottle on the steps of the property if the men did not take

the jacket." Compl ¶ 51. And instead of Crossland saying "it's my jacket," the complaint

alleges that Crossland merely responded to Wright's demand that someone take the jacket to

avoid Wright's threat to break the bottle on Crossland's walkway. *Id.* Plaintiffs agree in their

complaint that Wright then searched the red jacket and found the handgun. *Id.*

Overhearing the commotion outside, seventy-one year-old Ella Lane emerged from the

house and took pictures of the officers as they searched and then arrested the three men,

---

[4] The complaint states that Crossland is twenty-eight years-old, Compl. ¶ 12, but does not provide the ages of Boatwright or Crutchfield. There is no evidence in the affidavit or elsewhere suggesting that any of the men was younger than twenty-one or that the officers had reason to suspect that any of the three was underage. The allegations of the complaint and the affidavit also indicate that the three men were on private property at all relevant times. Compl. ¶ 16 & n.2; *cf.* D.C. Code § 25-1001 (prohibiting an open container of alcohol on various pieces of public property).

including her grandson.  Compl. ¶ 52.  After placing the men under arrest, several officers

walked up to the porch where Lane was standing and asked if they could go into the home to

speak with her.  *Id.* ¶ 54.  She refused entry, offering instead to speak with the officers outside.

*Id.*  The officers explained that they had found a gun on one of the men and that they wanted to

search her home.  *Id.* ¶¶ 54–55.  Lane asked whether Wright had a warrant, and he responded,

"[No], but I'm going in anyway."  *Id* ¶ 55.  He then walked past Lane and into her home along

with another, unnamed officer.  *Id.* ¶ 56.  She tried to follow them in, but Haselden "grabbed

[her] by the arm" and "forcibly pulled her back and restrained her from going back into her own

house."  *Id.* ¶¶ 56–57.  Wright and the unnamed officer searched the house for approximately ten

minutes.  *Id.* ¶ 58.  It does not appear that they found anything relevant or took anything with

them following the search.

> After this initial search, Wright left to seek a search warrant.  Compl. ¶ 64.  Three

officers "remained with . . . Lane to guard the house," and they did not allow Lane to re-enter her

home while they awaited the warrant.  *Id.* ¶ 65.  As a result, Lane waited outside on an

"uncomfortably chilly" October evening for "nearly four hours" and could not retrieve food or

water or use the bathroom in her home.  *Id.* ¶¶ 65–67.  She was finally able to use a bathroom

when her daughter, Adrian Crossland, came home and took her to a nearby McDonald's.  *Id.*

¶ 67.

> While Lane was forced to wait outside her home, Wright prepared the affidavit that

included his account of the events stated above, and he then applied for and obtained a warrant to

search the Crossland/Lane home.  *See* Dkt. 1-1.  In addition to describing the events that led up

to the arrest of the three men, the affidavit described a number of events that occurred after the

officers and three men arrived at the police station.  At the station, police officers identified the

seized firearm by its serial number as stolen, and all three men were then "additionally charged

with Unregistered Firearm and Unregistered Ammunition." *Id.* at 4.  The officers also examined

the gun and learned that it contained five rounds of ammunition in its magazine and one in its

chamber.  *Id.*  According to the affidavit, Boatwright "admitted to purchasing the Hennessy,

admitted the styrofoam cup with the liquid was his, . . . admitted the red jacket was his, [and]

admitted the weapon was his."  *Id.*  Significantly, the affidavit explained that Boatwright

correctly identified "the weapon [as] a '25' (.25 Caliber)" pistol and correctly stated that "it was

loaded with six (6) cartridges (rounds of ammunition) and that it was not registered."  *Id.*

The affidavit noted that Crossland admitted that he lived at the home that the officers

sought to search and that his D.C. driver's license confirmed this fact.  *Id.*  It also stated that a

woman named "Ella" came out of the house and told the officers that both she and Crossland

lived there.  *Id.*  Of particular relevance, the affidavit further stated:

> Based on your affiant's training, experience and participation in narcotic and drug
> related investigations, your affiant knows that, persons involved in illegal activities
> maintain books, records, documentation and other papers relating to the ordering,
> sales and servicing of their firearms.  I know that the aforementioned items are
> generally maintained where persons involved in criminal activity can obtain and
> read[ily] access them.  I also know that there people keep their firearms and
> ammunition inside of their homes.  One reason is to keep the police from recovering
> the firearms and another is to protect themselves from being robbed while inside
> their homes by others involved in illegal activities.  Ammunition in your Affiant's
> experience is sold in boxes, known as 'Bricks" containing 50 rounds of
> ammunition.  In your Affiant's experience, it is extremely uncommon for individual
> rounds of ammunition to be sold.  Since many guns, including the larger assault
> weapon models, do not carry 50 rounds of ammunition, it is very common that
> individuals store their extra ammunition in their places of residence.

*Id.* at 5.  The affidavit concluded by requesting a search warrant for the Crossland/Lane home

"for the reasons set forth and for any other evidence of a crime that may be found."  *Id.*  The

affidavit did not disclose that the requesting officers had already conducted an initial ten-minute

search of the home and that, during that brief search, they found no evidence of illegal activity.
*See* Compl. ¶¶ 56–59.

Judge Gregory Jackson of the Superior Court for the District of Columbia signed the
search warrant, permitting the MPD to search the plaintiffs' home for "[a]mmunition, [h]olsters,
[t]argets, [g]un [c]leaning kits, [o]ther [f]irearms, [n]otes, [l]edgers, [d]ocumentation and other
[p]apers [r]elating to the [o]rdering, [s]ales, [s]ervicing and use of their [f]irearms and [o]ther
[i]tems [r]elated to [i]legal [p]ossession of [f]irearms." Dkt. 1-1 at 1. The MPD executed the
search warrant, while Lane, now accompanied by her daughter, continued to wait outside.
Compl. ¶¶ 64–70. The complaint further alleges that the officers who conducted the search
"physically abused and verbally threatened" Lane. One officer, for example, allegedly told Lane
that he would force her to move from her home if he was ever called back to the house. *Id.* ¶¶ 6,
71. In addition, at some point during one of the two searches, an MPD officer allegedly deleted
from Lane's camera the photographs that she had taken of the arrest of her grandson earlier that
day. *Id.* ¶¶ 7, 73. The officers also "tore apart" Adrian Crossland's bedroom. *Id.* ¶ 74. It took
the family three days to clean up the mess left behind after the search. *Id.* Terrence Crossland,
meanwhile, spent the weekend in jail and was released on October 30, 2013. *Id.* ¶ 77. No
charges were filed against him in connection to the incident. *Id.* The MPD has not yet returned
a cellphone they took from Crossland when they arrested him. *Id.* ¶ 98.

## II. STANDARD OF REVIEW

A party moving to dismiss a complaint under Rule 12(b)(6) bears the burden of showing
that the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P.
12(b)(6); *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a
motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570, (2007)).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id.*  The Court need not accept

as true any legal conclusions disguised as factual allegations, "'naked assertion[s]' devoid of

'further factual enhancement,'" or a "'formulaic recitation of the elements of a cause of

action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (alteration in original).  The plaintiff,

however, is entitled to "the benefit of all inferences that can be derived from the facts

alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v.

Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)).

Police officers enjoy qualified immunity from personal liability for civil damages if "their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This

limited protection "balances two important interests—the need to hold public officials

accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Pearson v.

Callahan*, 555 U.S. 223, 231 (2009).  "The relevant, dispositive inquiry in determining whether a

right is clearly established is whether it would be clear to a reasonable officer that his conduct

was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  The

law is "[o]rdinarily" clearly established if there is "a Supreme Court or Circuit decision" on the

issue or [if] the clearly established weight of authority from other courts . . . ha[s] found the law

to be as the plaintiff maintains." *Doe v. District of Columbia*, 796 F.3d 96, 104 (D.C. Cir. 2015)

(quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)).  There need not be "a case

directly on point" for the right to be clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate" at the time the alleged violation occurred. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). In other words, the "contours" of the right must be "sufficiently clear" so that any "reasonable official would have understood that what he is doing violates that right." *Anderson v. Creighton* 483 U.S. 635, 640 (1987). A plaintiff seeking to overcome a claim of qualified immunity bears the burden of showing that the constitutional right that the officers allegedly violated was clearly established at the relevant time. *See Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015).

## III. ANALYSIS

The allegations in the complaint are far-ranging, challenging the lawfulness of the MPD officers' initial stop and search of the men on the steps outside the Crossland/Lane home, the search of the red jacket, Crossland's arrest, the initial search of the home, the refusal to allow Lane to enter her home for several hours, the refusal to return Crossland's cellphone, the deletion of the photographs from Lane's camera, insults that the officers directed at Lane during and after the search, the accuracy of information included in the application for a search warrant, and the omission of other relevant information from the application. Compl. ¶¶ 85–86, 89–90, 93–100. For present purposes, however, the Court will limit is analysis to the five specific issues raised in the defendants' motion to dismiss: (1) whether the MPD officers had probable cause to arrest Crossland; (2) whether their "protective sweep" of the Crossland/Lane home was lawful; (3) whether the application for the warrant for the subsequent search was supported by probable

cause; (4) whether the MPD officers who executed the search acted lawfully; and (5) whether the complaint states a claim for municipal liability under *Monell*.[5]

## A.      Arrest of Crossland

The complaint alleges that the officers who arrested Crossland acted without "probable cause to believe that he had committed any offense."  Compl. ¶ 98.  To avoid the defendants' qualified immunity defense with respect to this claim, Crossland must show (1) that the arresting officers violated Crossland's rights under the Fourth Amendment and (2) that "it would have been clear to a reasonable officer that [their] conduct was unlawful in the situation [they] confronted."  *Saucier*, 533 U.S. at 202.  As explained below, the Court cannot conclude at this stage of the proceeding that the arresting officers are protected by qualified immunity.

### 1.     *Warrantless Arrest*

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no [w]arrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  Although use of a warrant is the preferred course, "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or

---

[5]  Plaintiffs' opposition responded to these arguments but also defended other allegations in the complaint, which were not challenged in the defendants' motion.  *See* Dkt. 11.  Unsurprisingly, that led the defendants to address many of these issues for the first time in their reply brief.  *See* Dkt. 12.  The plaintiffs, with leave of the Court, then filed a surreply responding to the defendants' new arguments.  *See* Dkt. 13-1.  To avoid confusion, and to ensure that the parties receive a fair and complete opportunity to brief each of the many issues presented, the Court will consider only those arguments for dismissal raised in the defendants' motion and opening brief.  *See Jones v. Mukasey*, 565 F. Supp. 2d 68, 81 (D.D.C. 2008) ("As the D.C. Circuit has consistently held, the Court should not address arguments raised for the first time in a party's reply."); *see also McBride v. Merrell Dow & Pharm.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986).

is being committed."[6] *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004).  Probable cause "is a practical, non-technical conception" that considers "the facts and circumstances within [the officers'] knowledge and [about] which they had reasonably trustworthy information." *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949).  The inquiry focuses on what a reasonable officer would understand about the situation at hand and the arresting officer's actual "state of mind . . . is irrelevant." *Devenpeck*, 543 U.S. at 153.  The information available to the arresting officer must be sufficient to "warrant a man of reasonable caution [to] belie[ve] that an offense has been or is being committed," *Brinegar*, 338 U.S. at 175–76, by the specific "person to be . . . seized," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  In this respect, "Fourth Amendment case law makes clear that an officer cannot predicate a search or seizure on an individual's 'mere propinquity to others independently suspected of criminal activity.'" *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).

Here, Crossland was arrested (and held over the weekend) for carrying a pistol and possessing an open container of alcohol.  *See* Dkt. 1-1 at 4.  Given that Crossland was twenty-eight years-old, *see* Compl. ¶ 12, was sitting on his own property, *id.* ¶ 16 & n.2, and, in any event, was not holding or sitting next to the styrofoam cup containing what the officers believed to be alcohol, *see* Dkt. 1-1 at 2–3, it is not surprising that the defendants do not seek to defend his arrest based on the open container charge.[7]  They do argue, however, that there was probable cause to arrest Crossland for the illegal possession of handgun.  *See* Dkt. 9 at 11.  As explained

---

[6]  A warrantless arrest inside a home requires not just probable cause but also exigent circumstances necessitating entry into the home.  *See Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984); *Payton v. New York*, 445 U.S. 573, 590 (1980).

[7]  Under D.C. law, it is not unlawful to possess alcohol on private property.  *See* D.C. Code § 25-1001.

below, the Court concludes that the officers lacked probable cause to arrest Crossland on that ground as well.

As an initial matter, Crossland argues that the arresting officers lacked probable cause because Wright's search of the jacket that contained the gun was itself unconstitutional.  Dkt. 11 at 33.  According to Wright's affidavit, after the officers' initial interaction with Boatwright, Crossland, and Crutchfield, the three men stood to move to the front porch.  When Boatwright got up to move, however, he "neglect[ed] to pick up the red jacket that was next to him."  Dkt. 1-1 at 3.  Wright then said, "hey guys, ya'll left your jacket," and "[t]he three collectively responded denying ownership."  *Id.*  Putting aside for the moment Wright's intervening exchange with Crossland, which is contested, the parties agree that Wright subsequently searched the jacket and found the gun.  *Id.*; Compl. ¶ 23.  As Wright later explained, that search was premised on the theory that the jacket was "abandoned property," which Wright searched "in an effort to ascertain" who owned it.  Dkt. 1-1 at 3.

Crossland argues that this theory of abandonment is flawed as a matter of fact and law. He argues that Wright could not reasonably have believed that the jacket, which was located on private property and rolled up next to Boatwright on the steps, was abandoned property, and he contends that the concept of abandonment is inapplicable, as a matter of law, to property that is not left in a "public place."  Dkt. 11 at 34.  The defendants, in response, argue that property is deemed "abandoned" for purposes of the Fourth Amendment when "[a] voluntary denial of ownership demonstrates sufficient intent of dissociation to prove abandonment."  Dkt. 12 at 9 (quoting *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990)).

As the defendants correctly argue, *see* Dkt. 9 at 7, Wright's search of the jacket is irrelevant to Crossland's claim that his arrest was unlawful.  For present purposes, Crossland

acknowledges that the jacket, in fact, belonged to Boatwright. *See* Compl. ¶¶ 26–27. The Fourth

Amendment, however, covers places and property only in which the individual seeking its

protection has a "reasonable expectation of privacy." *Katz v. United States*, 389 U.S. 347, 360

(1967) (Harlan, J., concurring). That is, Fourth Amendment rights "are personal" and "may not

be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). As a result, "[a]

person who is aggrieved by an illegal search and seizure only through the introduction of

damaging evidence secured by a search of a third person's premises or property has not had any

of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134, (1978); *see*

*also United States v. Leon*, 468 U.S. 897, 905–06 (1984) ("The Fourth Amendment contains no

provision expressly precluding the use of evidence obtained in violation of its commands, and an

examination of its origin and purposes makes clear that the use of fruits of a past unlawful search

or seizure 'work[s] no new Fourth Amendment wrong.'" (quoting *United States v. Calandra*, 414

U.S. 338, 354 (1974)). Crossland, accordingly, cannot challenge the lawfulness of *his* arrest

based on the claim that the sole evidence of his wrongdoing—the handgun found in the jacket—

was the product of an illegal search of *Boatwright's* jacket.

That conclusion does not, however, dispose of Crossland's claim that defendants lacked

probable cause to arrest him for possession of the gun. As discussed above, the existence of

probable cause requires a fact-specific inquiry into whether the arresting officers had a

"particular[ized]" and "reasonable" belief that Crossland personally committed a crime. U.S.

Const. amend. IV; *Devenpeck*, 543 U.S. at 152; *Pringle*, 540 U.S. at 370–71. The defendants'

opening brief points to only one fact in support of their claim that the officers had probable cause

to arrest Crossland: according to Wright, Crossland "flatly stated that he owned the jacket

containing the stolen pistol." Dkt. 9 at 11. But that argument suffers from a fatal flaw: the

14

complaint alleges that Wright's description of what occurred is false, and the Court must accept the allegations of the complaint—as opposed to Wright's competing rendition of the facts—for purposes of resolving the defendants' motion to dismiss. *See Hishon*, 467 U.S. at 73.  In contrast to Wright's version of events, the complaint alleges that Wright "threatened to smash the glass bottle [of Hennessy] on the steps of [Crossland's] property if the men did not take the jacket," and that Crossland merely agreed to take the jacket to prevent Wright from smashing the bottle of Hennessy on his walkway.  Compl. ¶ 51.  According to the complaint, Crossland never said that the jacket was his, and thus that presumptively counterfactual premise cannot support the defendants' motion to dismiss.

The defendants come closer to the mark in their reply brief, where they accept the allegations of the complaint for purposes of their motion to dismiss and argue that Crossland's request that Wright "hand him the jacket" provided sufficient basis for a reasonable officer to infer that Crossland "had some connection to the jacket."  Dkt. 12 at 9.  When considered in light of all of the relevant circumstances, however, the Court remains unconvinced that there was probable cause to arrest Crossland.

To start, the Court notes that even the defendants do not equate Crossland's request that Wright "hand him the jacket" with a claim that the jacket was his.  They instead assert that Crossland's request indicated merely that he "had some connection to the jacket."  *Id.*  It is unclear what this means.  For present purposes, however, it suffices to note that there is a substantial difference between the assertion, "yeah man, it's my jacket" and the assertion, "hand it to me," made only after Wright allegedly "threatened to smash the glass alcohol bottle on the steps of [Crossland's] property if the men did not take the jacket."  Compl. ¶ 51.  This distinction is reinforced, moreover, by Wright's response to Crossland's request for the jacket.  Rather than

handing Crossland the jacket following this exchange, Wright searched the jacket on the theory that none of the three men had claimed ownership and that the jacket was thus "abandoned property." Compl. ¶¶ 21–22. Wright's conclusion that the jacket was "abandoned" supports Crossland's version of the facts and suggests that a reasonable observer in the officers' position would not have construed Crossland's agreement to take the jacket in response to a threat of smashed glass on his property as tantamount to an assertion of ownership.

Even more significantly, it is undisputed that Crossland and Crutchfield were already wearing jackets and that Boatwright was the only one of the three who was not wearing a jacket. *Id.* ¶ 21. The jacket, moreover, was rolled up in a ball on the steps next to where Boatwright had been sitting. Dkt. 1-1 at 3. At the time, Boatwright was seated alone on the top step, while Crossland and Crutchfield were seated in front of him. *Id.* at 2. Thus, only one of the three men—Boatwright—was not already wearing a jacket, and the jacket was found next to where only one of the three men—again, Boatwright—had been sitting. The commonsense conclusion from these facts is that the jacket belonged to Boatwright. And Wright shared this belief: in his affidavit, he noted that he was skeptical that the jacket belonged to Crossland "because he was already wearing a jacket[,] and . . . Boatwright was the only individual in the group to not have a jacket on." Dkt. 1-1 at 3. So skeptical, in fact, that immediately after Crossland asked Wright to hand him the jacket, Wright told *Boatwright*—but not either of the other two men—to sit back down on the steps before Wright searched the jacket. *Id.* Although the probable cause inquiry does not turn on the subjective belief of the arresting officer, *Devenpeck*, 543 U.S. at 153, the inference that an experienced officer like Wright drew as the events at issue actually unfolded sheds light on what a reasonable officer in this situation would conclude. Construing the facts in the light most favorable to Crossland, the Court holds that there was insufficient basis to

16

"warrant a man of reasonable caution [to] belie[ve] that" the jacket belonged to Crossland. *Brinegar*, 338 U.S. at 175–76.

Finally, the defendants gesture at an argument that Crossland constructively possessed the jacket, either because it was on his property, *see* Dkt. 9 at 11, or because he was sitting near it, *see* Dkt. 12 at 9.  The defendants offer no explanation or analysis in support of either theory— and for good reason.  "Constructive possession is established when a person, though lacking such physical custody, still has the power and intent to exercise control over the object." *Henderson v. United States*, 135 S. Ct. 1780, 1784 (2015).  To prove constructive possession of a firearm under D.C. law, "the government [must] show that [defendant] (1) knew of the location of the handgun; (2) had the ability to exercise dominion and control over it; and (3) intended to exercise dominion and control over it." *Burnette v. United States*, 600 A.2d 1082, 1083 (D.C. 1991).  Here, the defendants offer no basis to believe that the mere presence of the gun on Crossland's property—or the fact that the gun was within his reach, even if unknown to him—meant that he "intended to exercise dominion and control over it."  Indeed, they offer no evidence or reason to infer that Crossland even knew that there was a gun in the jacket's pocket.  Taken to its extreme, the defendants' first argument (that the jacket was on Crossland's property) would mean that Crossland's mother and grandmother were also subject to arrest because the gun was found on their property.  And their second theory (that the jacket was within Crossland's reach) would mean that there is probable cause to arrest someone for illegal possession of handgun if a firearm belonging to someone else is anywhere within reach—even if it is on another person or in his clothing, unbeknownst to the arrestee.  That is not the law.

2.    *Qualified Immunity*

Having concluded (based on the allegations in the complaint) that the arresting officers

lacked probable cause to arrest Crossland, the Court must consider whether a claim for damages

against the individual officers is barred by qualified immunity.  "[Q]ualified immunity shields

police officers from civil liability so long as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known."  *Mullenix v.

Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation marks omitted).  The Supreme

Court, moreover, has repeatedly admonished "courts . . . not to define clearly established law at a

high level of generality.'"  *Al-Kidd*, 563 U.S. at 742.  Rather, because qualified immunity is

designed to ensure that only those officers who were "on fair notice that their conduct was

illegal" are subject to suit, *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1028

(10th Cir. 2015), the Court must consider whether "existing precedent" was sufficiently clear and

specific to "have placed the statutory or constitutional question beyond debate," *al-Kidd*, 563

U.S. at 741.

Here, the facts are uncontested for purposes of the defendants' motion to dismiss.  The

relevant facts and circumstances would have led a reasonable officer to believe—as Wright

apparently did, *see* Dkt. 1-1 at 3—that the jacket likely belonged to Boatwright.  But there was

*some* evidence that the jacket belonged to Crossland.  There was ample reason to believe that it

belonged to one of the three men who sat on the steps, and none of the men claimed ownership

when initially asked.  Two facts implicated toward Boatwright:  he was the only one of the three

who was not wearing a jacket, and the jacket was next to him.  One fact, although far less

probative, pointed to Crossland: he agreed to take the jacket when Wright threatened to smash

the bottle of Hennessy if the men left the jacket on the steps.  There was apparently no evidence to implicate Crutchfield for possession of the firearm other than his presence at the scene.

The relevant question, then, is whether a reasonable officer would have understood that it was unconstitutional to arrest all three men for what appeared to be a single crime, when the most compelling evidence pointed toward Boatwright.  Neither Crossland nor the defendants cite any precedent directly on point, and the law on the quantum of evidence required to justify a warrantless arrest is notoriously, if not intentionally, amorphous.  Indeed, starting with its decision in *Brinegar*, the Supreme Court has steered clear of articulating a precise standard for finding probable cause.  In that case, the Supreme Court explained that probable cause, "as the very name implies," requires that courts "deal with probabilities."  338 U.S. at 175.  But the Court failed to identify how probable is probable enough, and instead merely instructed that the answer lies somewhere between the extremes of a "bare suspicion" and evidence sufficient to sustain a "conviction."  *Id.*  Subsequent cases have also declined to fill this gap.  In *Gates*, 462 U.S. at 235, for example, the Court explained that "finely-tuned standards such as proof . . . by a preponderance of evidence, [which are] useful in formal trials, have no place in the magistrate's [probable cause] decision," and that "an effort to fix some general, numerically precise degree of certainty corresponding to 'probable cause' may not be helpful."  *Id.* at 235.  And while other "Supreme Court decisions may be read as adopting a more-probable-than-not test," a leading commentator has observed that "the Court's more recent decision in *Maryland v. Pringle* can be interpreted otherwise."  Wayne R. LaFave, 2 *Criminal Procedure* § 3.3(b) (4th ed.).  Thus, although it is "well established" that "probable cause to arrest requires at least *some* evidence that the arrestee's conduct meets each of the necessary elements of the offense that the officers believed supports arrest," *Wesby v. District of Columbia*, 765 F.3d 13, 26 (D.C. Cir. 2014)

(emphasis added), existing precedent does not clearly define precisely how much more than a "bare suspicion" the law requires.

Similarly, existing precedent does not provide clear guidance regarding the circumstances under which the police may arrest multiple individuals where the evidence "does not point exclusively to one particular individual." Wayne R. LaFave, *Search and Seizure* § 3.2(e) (5th ed.). To be sure, as Crossland stresses, well-settled law precludes a "round 'em all up," Dkt. 11 at 33, approach to law enforcement, *see Barham*, 434 F.3d at 573. On the other hand, at least some commentators have suggested that there are times when more than one suspect may be arrested for a single crime. This point is perhaps best framed in the Restatement (Second) of Torts, which offers the following example: Assume that a police officer sees "B and C bending over a dead man" and that "B and C each accuse the other of murdering" the victim. Restatement (Second) of Torts § 119, comment j (1965). Under those circumstances, according to the Restatement, the police officer would be "privileged to arrest either or both," even though he could not conclude that it was more probable than not that either committed the crime. *Id.*; *see also* LaFave, *Search and Seizure* § 3.2(e). That view, moreover, arguably finds some support in the Supreme Court's decision in *Pringle,* where the police arrested Pringle along with two other men who were riding in a car that had "$763 of rolled-up cash in the glove compartment," and five "baggies of cocaine behind the back-seat armrest." 540 U.S. at 371–72. None of the three men admitted guilt at the time of the arrest, and there was little or no basis to distinguish between their likely guilt. The Supreme Court, nonetheless, held that there was ample basis to find "probable cause to believe Pringle committed the crime of possession of cocaine, *either solely* or jointly." *Id.* at 372 (emphasis added); *see also Perkins v. United States*, 936 A.2d 303, 307 (D.C. 2007) (relying on *Pringle* in holding that the "modest showing required for probable

cause" justified arresting both driver and passenger in a car, even if "we posit that joint possession of [the contraband] was unlikely"); LaFave, *Search and Seizure* § 3.2(e) ("Whether [the reference to sole liability] was a mere slip of the pen is unclear, but if it is not it may well be grounded in" the view that probable cause does not require that the suspects' guilt be more likely than not.).

Against this background, it is safe to conclude the "question of probable cause in multi-suspect situations is far from beyond debate." *Callahan*, 806 F.3d at 1028. Based on this lack of clarity, moreover, one might conclude that qualified immunity protects officers who make multi-suspect arrests from liability. But, uncertainty does not mean that there is no limiting principle. A mass arrest of everyone in a park, for example, crosses a clearly established line, even where there is "probable cause to believe that *some people* present . . . had committed arrestable offenses." *Barham*, 434 F.3d at 572–73. Here, as the record currently stands, the Court cannot conclude that defendants are entitled to qualified immunity.

Accepting the facts as alleged in the complaint, and drawing all factual inferences in favor of the plaintiffs, the likelihood that the gun belonged to Crossland was not just shy of more probable than not or that a reasonable officer could not distinguish between the likely culpability of Crossland and Boatwright. To the contrary, the evidence tipped decidedly toward the conclusion that the gun belonged to Boatwright. Moreover, unlike the drugs in *Pringle*—and, again, drawing all inferences in plaintiffs' favor—there was no reason to believe that all three men jointly possessed the gun or that they were "engaged in a common [illegal] enterprise." *Pringle*, 540 U.S. at 373. The Court is thus left with a circumstance in which one of three men likely committed a crime, compelling evidence indicated that the gun belonged to Boatwright, yet the police arrested all three. If that is what in fact occurred, it runs afoul of the Supreme

Court's admonition that, "[w]here the standard is probable cause, a search or seizure of a person must be supported by probable cause *particularized* with respect *to that person*." *Ybarra*, 444 U.S. at 91 (emphasis added). And even if *Pringle* narrowed *Ybarra*, *see Callahan*, 806 F.3d at 1028–29, it did not go so far as to permit the arrest of three suspects for a single offense where the evidence points decidedly at one of those suspects—as opposed to the other two. *Cf. id.* at 1029 (describing *Pringle*'s holding as permitting an officer to "reasonably infer that all present were involved in [a] crime" when "[e]vidence of a 'common enterprise' existed"); *see also Mallory v. United States*, 354 U.S. 449, 456 (1957) ("It is not the function of the police to arrest . . . at large and to use an interrogating process at police headquarters in order to determine whom they should" ultimately charge with the crime.); *Wong Sun v. United States*, 371 U.S. 471, 479–80 (1963); *Barham*, 434 F.3d at 573.

It bears emphasis, however, that this decision is limited to the record as it now stands, accepting Crossland's allegations as true, drawing all factual inferences in his favor, and not including any evidence defendants offer regarding the circumstances of the arrest. The exact nature of the exchange between Wright and Crossland, for example, may shed additional light on the question, and the defendants may be able to identify other evidence that would support the reasonable belief that Crossland committed a crime. On the current record, the Court finds that a reasonable officer would have concluded that very likely the gun belonged to Boatwright and that it was correspondingly very unlikely that it belonged to Crossland (or Crutchfield). On these facts, which would benefit from further development, Crossland's arrest would have violated clearly established law. *See Ybarra*, 444 U.S. at 91; *Barham*, 434 F.3d at 573. In short, no reasonable officer would believe that he could arrest someone even though the officer believes it is far likelier that someone *else* committed the crime of arrest.

**B.      Protective Sweep of the Crossland/Lane Home**

The fifth count of the complaint alleges that Wright and a second, unidentified officer violated plaintiffs' Fourth Amendment rights by entering and briefly searching their home after the arrest of Boatwright, Crossland, and Crutchfield but before obtaining a warrant.  In response, the defendants argue that this ten-minute search was a justified "protective sweep," and ask that the Court dismiss this claim on that basis.  *See* Dkt. 9 at 13–14.  For the reasons explained below, the Court will deny the defendants' motion to dismiss Count Five.

1.      *Warrantless Search*

Courts have long recognized that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *United States v. United States District Court*, 407 U.S. 297, 313 (1972).  Accordingly, a police officer may "invade the sanctity of the home" without first obtaining a search warrant only if "the government [can] demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries."  *Welsh*, 466 U.S. at 750; *see also Payton*, 445 U.S. at 590 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."); *Kentucky v. King*, 563 U.S. 452, 459 (2011) ("It is a basic principle of Fourth Amendment law, we have often said, that searches and seizures inside a home without a warrant are presumptively unreasonable. . . . But we have also recognized that this presumption may be overcome in some circumstances because [t]he ultimate touchstone of the Fourth Amendment is reasonableness." (internal quotation marks and citation omitted) (second alteration in original)).  This requirement applies, moreover, even "when a felony has been committed and there is probable cause to

believe that incriminating evidence will be found within." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (internal citations omitted).

Here, the defendants identify only one "exigent circumstance" that they say justified the warrantless search of the Crossland/Lane home—that a "protective sweep" of the home was necessary to ensure that no one was located in the home who might pose a danger to the officers or others while they completed the arrests of Boatwright, Crossland and Crutchfield.  Dkt. 9 at 13–14.  In support of this contention, however, they offer no evidence and merely ask that the Court infer from the allegations of the complaint that a protective sweep was justified.  They assert that "[h]aving found one gun on the scene, the officers reasonably believed . . . that there may be other guns on the property," and that the officers were also justified in their concern because they "observed a fourth individual coming out of the house."  *Id.*

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."  *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  The courts have identified "two types of protective sweeps."  *United States v. Ford*, 56 F.3d 265, 268 (D.C. Cir. 1995).  First, "as incident to [an] arrest," police officers may, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched."  *Buie*, 494 U.S. at 334.  Second, "[b]eyond that," the officers may conduct a protective sweep only when the presence of "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Id.*

24

The defendants do not argue that this case involves the first type of sweep, nor could they.  The three men were arrested outside the plaintiffs' home, and there is no basis to believe that the search was limited to the space "immediately adjoining" the plaintiffs' "yard and porch," where the arrests occurred.  *Id.*; Compl. ¶ 52.  Indeed, even if the officers *might* have been justified in searching the entryway of the home or any other space "immediately adjoining the place of arrest," *Buie*, 494 U.S. at 334, that would not—at least without further explanation and evidence—justify a ten-minute search of the home.

Nor can the Court conclude based on the bare pleadings that "articulable facts" support the "rational inference" that a "prudent officer" would believe that the house "harbor[ed]" anyone who "pos[ed] a danger to those on the arrest scene."  *Buie*, 494 U.S. at 334.  The defendants rely entirely on the discovery of a handgun in the pocket of a jacket on the steps leading up to the house.  Dkt. 9 at 14.  Even if that fact may have justified the officers in believing that the men on the steps posed a danger, all three were under arrest by the time the protective sweep occurred.  As the D.C. Circuit has repeatedly observed, once an individual is under arrest, "he no longer pose[s] a threat to the police."  *United States v. Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995); *United States v. Ford*, 56 F.3d at 269.  The question, then, is whether a prudent officer might have reasonably inferred that the arrestees had confederates in the house who might have posed an immediate risk.

In at least one case, the D.C. Circuit has held that an arrest outside a residence supported a protective sweep of the residence.  *See United States v. Henry*, 48 F.3d at 1282, 1284–85 (D.C. Cir. 1995).  That decision establishes that "[a]lthough *Buie* concerned an arrest made in the home, the principles enunciated by the Supreme Court are fully applicable where, as here, the arrest takes place just outside the residence."  *Id.* at 1284.  But the fact that an arrest occurred

outside, rather than inside, the residence remains "relevant to the question whether" the officers "could reasonably fear an attack by someone within it." *Id.*  In *Henry*, the D.C. Circuit concluded that the protective sweep was justified only because an informant had told the police that the suspect whom they sought to arrest "would have weapons and that [his] 'boys' or 'counterparts' . . . might be with him." *Id.*  Furthermore, the reasonable concern of the arresting officers was heightened by the fact that the arrest was effectuated "just outside the open door" to the apartment" and by the fact that they heard the arrestee tell another man—who was outside the building peering into a window to the hallway—"they got me," thereby also potentially alerting any of the arrestee's "boys" who might be hiding in the apartment. *Id*.

In contrast to *Henry*, the only evidence the defendants identify here, *see* Dkt. 9 at 14, that might support an inference that there were others in the house who might have posed an immediate danger to the arresting officers was the fact that Lane—a seventy-one year-old woman—emerged from the house and "started taking photos of where the officers were and what they were doing," Compl. ¶ 52.  It is a stretch, to say the least, to contend that Lane's actions provided a reasonable basis to infer that others, who might pose an immediate danger, were also harbored in the house.

There is also a separate problem with the officers' assertion that they were entitled to conduct a protective sweep:  The existing record does not disclose the scope of the ten-minute search of the home.  A search of an entire house constitutes a far more substantial invasion of privacy than a visual inspection of the rooms adjacent to where the arrest occurs. *Cf. Riley v. California*, 134 S. Ct. 2473, 2488 (2014).  At this phase of the litigation, the Court does not know whether the officers who conducted the search opened drawers, looked under mattresses, and made their way through the entire home, or whether they simply walked through the spaces

proximate to the front porch.  Absent those details, the Court cannot conclude that the officers

conducted merely a protective sweep—even if such a sweep was justified—instead of a full-

blown search.  Granting all inferences to the plaintiff, the Court would conclude that it is

possible they could prevail on this claim even assuming the officers could conduct a protective

sweep.

The Court, accordingly, concludes that the defendants failed to identify the type of

"articulable facts" that would ordinarily support a protective sweep, or that the ten-minute search

of the home constituted such a sweep.  This is not to say that the defendants' actions were

unjustified, but only that the present record is insufficient to conclude that they are currently

entitled to prevail as a matter of law.

2.      *Qualified Immunity*

For similar reasons, the Court concludes that the present record does not establish that the

defendants are entitled to qualified immunity as a matter of law.  The relevant law is well-settled.

A protective sweep is permissible only to secure the immediate area of an arrest or to mitigate a

reasonable suspicion—based on articulable facts—that "the area to be swept harbors an

individual posing a danger to those on the arrest scene."  *Buie*, 494 U.S. at 334.  Here, a

reasonable officer would have understood this rule and that the three men who were under arrest

outside the home posed no such threat.  *See Henry*, 48 F.3d at 1284.  Aside from the discovery of

a handgun on one of these three men, the only other fact that the defendants currently rely upon

is Lane's emergence from the home.  The Court cannot agree that a reasonable officer would

have believed, based on the appearance of a  seventy-one year-old resident taking pictures with a

camera, that the house might be harboring an individual who "pos[ed] a danger to those on the

arrest scene."  *Buie*, 494 U.S. at 334.  Based on the current record, the Court accordingly cannot

conclude that the officers' actions were protected by qualified immunity.  And as the Court just explained, it is plausible that the scope of the ten-minute search went beyond a protective sweep to ensure officer safety.  If the officers spent more time in the home than was necessary to ensure their safety, then they conducted a warrantless search in violation of the Fourth Amendment without any exigent circumstances, and qualified immunity would not protect them.  *See Payton*, 445 U.S. at 590; *Steagald v. United States*, 451 U.S. 204, 216 (1981) ("[W]arrantless searches of a home are impermissible absent consent or exigent circumstances.").

## C.      Probable Cause to Obtain the Search Warrant

The centerpiece of the plaintiffs' case attacks the defendants' acquisition and execution of the warrant to search the Crossland/Lane home.  As in the companion cases to this one, *see supra* n. 1, the plaintiffs argue that the warrant application was "egregiously lacking in probable cause," Compl. ¶ 28, and that it contained "knowingly and recklessly false and misleading" statements as well as material omissions that "would have undermined the asserted probable cause basis for issuing the warrant," *id.* ¶ 88.  The defendants disagree, arguing that the application contained ample evidence to support a finding of probable cause and that the "alleged omissions" from the application were "irrelevant."  Dkt. 9 at 10.  For the reasons explained below, the Court concludes that, if the plaintiffs' allegations are accepted as true, and if the allegedly false information is accordingly excised from the application and the omitted information is added, the application plainly fails to establish probable cause to search the Crossland/Lane home.

As both Judges Boasberg and Chutkan have recently explained in cases similar to this one, *see Davis v. District of Columbia*, 156 F. Supp. 3d 194, 200 (D.D.C. 2016); *Pitts v. District of Columbia*, 2016 WL 1301046, at *7–9 (D.D.C. Mar. 31, 2016), the starting point in evaluating

the sufficiency of a warrant application in the face of alleged falsity is the Supreme Court's

decision in *Franks v. Delaware*, 438 U.S. 154 (1978).  There, the Court explained that all

warrant applications carry an expectation of truthfulness:

> When the Fourth Amendment demands a factual showing sufficient to comprise
> "probable cause," the obvious assumption is that there will be a *truthful* showing.
> This does not mean "truthful" in the sense that every fact recited in the warrant
> affidavit is necessarily correct, for probable cause may be founded upon hearsay
> and upon information received from informants, as well as upon information within
> the affiant's own knowledge that sometimes must be garnered hastily.  But surely
> it is to be "truthful" in the sense that the information put forth is believed or
> appropriately accepted by the affiant as true.

438 U.S. at 164–65 (internal quotation marks and citation omitted).  As a result, "the deference

[typically] accorded a magistrate's finding of probable cause," *United States v. Leon*, 468 U.S.

897, 914 (1984), gives way when the affidavit upon which the magistrate relied "contain[ed] a

deliberately or recklessly false statement," *Franks*, 438 U.S. at 165.  Simply put, "because the

judicial officer would typically have no reason to suspect the falsehoods," *Davis*, 156 F. Supp.

3d at 201, neither the court nor the parties can take any comfort in a magistrate's finding of

probable cause.

A finding—or, at this stage of the litigation, an allegation—of deliberate or reckless

falsity, however, does not end the inquiry.  The Court must then ask whether the falsity was

material; that is, once "the affidavit's false material [is] set to one side," the Court must assess

whether the remaining portions of the affidavit are sufficient "to establish probable cause."

*Franks*, 438 U.S. at 156.  The same two-step approach applies to omissions as well.  The Court

must first determine whether the affiant deliberately or recklessly omitted relevant information

and must then ask whether "inclusion" of the omitted information "in the affidavit would [have]

defeat[ed] probable cause."  *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008)

(internal quotation marks omitted).  Whether a plaintiff's claim is premised on a deliberate

falsehood or omission, the Court's task is the same.  It must excise any information that is

allegedly false and include any information allegedly omitted, thus creating a "hypothetical,

redacted affidavit," and it must then ask whether that affidavit "still established probable cause."

*United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013).  The particular aspect of probable

cause relevant to this case is the so-called "nexus" requirement: the government must have

"reasonable cause to believe that the specific 'things' to be searched for and seized are located on

the property to which entry is sought."  *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).

Absent such a nexus between the items sought and the property the police hope to search, there is

no probable cause.

    The warrant to search the Crossland/Lane home was premised exclusively on Wright's

affidavit.  *See generally* Dkt. 1-1.  That document begins with a recitation of Wright's version of

the events that led to the arrest of the three men.  It explains that, after returning to the police

station, the officers learned that the handgun was a stolen .25 caliber pistol, which contained five

rounds of ammunition in the magazine and a sixth round in the chamber.  *Id.* at 4.  It noted that

Boatwright admitted that the red jacket and gun (as well as the Hennessy and styrofoam cup)

were his and that Boatwright confirmed this fact by correctly telling the officers that the gun

contained six rounds.  *Id.*  It averred that Crossland—but not the other men—lived at the

residence the officers sought to search.  *Id.*  It contained Wright's representation that he knew,

based on his "training, experience and participation in narcotic and drug related investigations"

that "persons involved in illegal activities maintain books, records, documentation and other

papers relating to the ordering, sales and servicing of firearms" in a place where they "can obtain

and read[il]y access them."  *Id.* at 5.  And based on this same training and experience, Wright

claimed personal knowledge that "people keep their firearms and ammunition inside their

homes," and that because "it is extremely uncommon for individual rounds of ammunition to be sold[,] . . . it is very common that individuals store . . . extra ammunition in their place of residence." *Id.*

The plaintiffs claim that many of these assertions were knowingly or recklessly false. First, as discussed above, the plaintiffs dispute Wright's description of the events leading up to the arrest of the three men.  Most notably, while Wright says that Crossland claimed that the red jacket was his, the plaintiffs contend that he merely agreed to take the jacket from Wright after Wright threatened to break the bottle of Hennessy on Crossland's walkway "if the men did not take the jacket."  Compl. ¶ 51.  Second, they allege that Wright's representation that his training and experience provided support for the search was demonstrably false.  Far from supporting probable cause, they allege, the actual experience of the MPD shows that "MPD officers rarely find [the types of items sought here] and that, based on information collected and produced by the MPD it was," in fact, "overwhelmingly likely that the [officers] would *not* find the items listed."  *Id.* ¶ 39.  And while Wright claimed that "it is extremely uncommon for individual rounds of ammunition to be sold," Dkt. 1-1 at 5, thus suggesting that the officers might find additional rounds in the Crossland/Lane home, the plaintiffs allege that other MPD officers have submitted affidavits in other cases averring that "there are often places where you can buy loose bullets or individual bullets from other gun possessors," Compl. ¶ 44.

The plaintiffs also allege that Wright omitted material information from his affidavit.  For one, they point out that Wright failed to disclose in his four-page, single spaced affidavit that he and another officer had already conducted a ten-minute search of the Crossland/Lane home and that they found no evidence of wrongdoing.  *Id.* ¶ 4.  For another, they allege that Wright "failed to inform the judge . . . that many firearms . . . are passed and traded by individuals without

documentation or records, and without the person possessing any of the receipts or accoutrements of legal gun ownership." *Id.* ¶ 43.  And finally, as in similar cases pending in this Court, they argue that Wright omitted statistics and other material information that would have permitted the issuing judge to conclude that, even if the handgun belonged to Crossland, it was extremely unlikely that the MPD would have found evidence of any illegal firearms activity in Crossland's home.  They allege, for example, that "in the one-year period surrounding and including the search of the Lane family home" warrants "based only on the seizure of a firearm in a street stop and [the officer's] 'training' and 'experience' . . . failed to find any guns in the home" 91% of the time, and that those searches seeking the type of "documentation" the officers sought here were successful even less often.[8]  *Id.* ¶¶ 40-41.

The defendants do not confront the allegations that Wright's declaration included deliberate falsehoods or that he deliberately omitted any reference to the protective sweep of the Crossland/Lane home.  *See* Dkt. 9 at 7–12.  They instead focus on the plaintiffs' argument that the warrant omitted statistical evidence regarding the limited success rate of similar warrants based on MPD officers' actual experience.  *Id.* at 10–11.  In particular, they rely on a Supreme Court case that cautioned against overreliance on the statistical success rate of drug-sniffing dogs.  *See* Dkt. 12 at 4 (citing *Scott v. Harris*, 133 S. Ct. 1050, 1056–57 (2013)).  In their reply brief, the defendants raise additional potential flaws with the data the plaintiffs have proffered: they say that the sample size is too small; that there may be cases where officers arrested

---

[8]  The plaintiffs also complain that the affidavit fails to say the officers illegally entered Lane's yard and searched Boatwright's jacket.  *See, e.g.*, Compl. ¶¶ 49, 51.  These issues would be relevant, however, only if they could result in the Court excising from the search warrant Wright's discovery of the firearm in Boatwright's jacket.  The Court has already explained, however, that the Fourth Amendment does not offer the plaintiffs any protection from a search warrant based on information unconstitutionally seized from the jacket.

individuals for unlawful gun possession but did not seek a search warrant; that officers could have simply missed relevant evidence during the execution of some of the unsuccessful search warrants; and that in some of the sample cases, evidence might have been removed from a home between the arrest and the execution of the warrant. *See id.* These potential flaws, the defendants argue, undermine the relevance of the plaintiffs' statistics and render their omission immaterial. *Id.* at 4–5. Finally, the defendants maintain that the fact that Boatwright—who had confessed at the station to owning the gun—did not live at the Crossland/Lane address "does not detract from finding probable cause." Dkt. 9 at 11.

At least at this early stage of the litigation, the Court is unpersuaded. The defendants are correct that the statistics the plaintiffs offer may be flawed and that these statistics, standing alone, do not conclusively show that the warrant lacked probable cause. But it is not the Court's role to resolve this dispute on a motion to dismiss. The complaint alleges that Wright's affidavit deliberately included false statements and omitted conflicting, material information regarding his "training" and "experience" in an effort to establish the required connection between the gun found in the jacket and the search of the Crossland/Lane home. As Judge Boasberg observed in *Davis*, although probable cause is not a formulaic concept susceptible to precise measures of probability, that does not render statistical evidence of the type the plaintiffs invoke irrelevant. *See* 156 F. Supp. 3d at 201. To the contrary, the MPD's own reliance on "training" and "experience"—and the D.C. Circuit's past reliance on assertions of that type[9]—confirm that actual experience is properly considered as part of the "totality of circumstances" that inform the

---

[9] *See, e.g., United States v. Washington*, 775 F.3d 405, 409 (D.C. Cir. 2014); *United States v. Cardoza*, 713 F.3d 636, 661 (D.C. Cir. 2013); *Spencer*, 530 F.3d at 1007; *United States v. Johnson*, 437 F.3d 69, 72 (D.C. Cir. 2006); *United States v. Thomas*, 989 F.2d 1252, 1255 (D.C. Cir. 1993) (per curiam).

probable cause determination.  That experience, moreover, must bear a logical connection to the circumstances facing the officers in any given case.  Here, defendants do not contest that Boatwright did not live at the house that the officers searched, and they offer no explanation of how Wright's "training" and "experience" could possibly have supported the contention that evidence of *Boatwright's* criminal activity might be found in *Crossland's* house.  The absence of a nexus is the absence of probable cause.

While focusing their attack on the probity of the plaintiffs' statistics, the defendants fail to make an argument that bears more serious consideration.  More than two decades ago, the D.C. Circuit upheld a finding of probable cause to search a suspect's home based, in part, on the affiant's "experience" that "drug dealers frequently keep business records, narcotics, proceeds from sales, and firearms in their homes."  *Thomas*, 989 F.2d at 1255.  More recently, that court went a step further, not only deferring to a police officer's assertion in a search warrant affidavit that "his training and experience" showed that "'narcotics traffickers often keep additional supplies of narcotics within their residences,' along with weapons and large sums of cash," but adding:  "The officer's commonsense assessment echoes this Court's own analysis of the matter," that is "'[c]ommon experience suggests that drug dealers must mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade . . . in secure locations," and that "[f]or the vast majority of drug dealers, the most convenient location to secure items is the home.'"  *Cardoza*, 713 F.3d at 661 (quoting *Spencer*, 530 F.3d at 1007).

But even if the defendants had relied on the the *Thomas* line of cases, the Court would conclude that the complaint should survive a motion to dismiss for two reasons.  First, the plaintiffs allege with some specificity that Wright's training and experience in fact support the opposite conclusion.  No such proffer was made in *Thomas* or *Cardoza*, and thus the only

evidence before the D.C. Circuit in those cases supported the conclusion reflected in its

decisions.  Second, even putting that difference aside, it is far from clear that the same common

sense that applies to drug dealers applies to those who unlawfully possess handguns.  To the

contrary, it seems implausible that people illegally possessing handguns typically "maintain

books, records, documentation and other papers relating to the ordering, sales and servicing of

their firearms."  *See* Dkt. 1-1 at 5.  It strikes this Court as common sense that people do not tend

to keep paperwork concerning their *stolen* firearms, like the gun seized in this case.  Nor is it

self-evident that those who illegally possess guns on the street keep additional ammunition in

their homes.  As Judge Lamberth has explained:  "While drug dealers usually require a place to

store their inventory, gun owners can (and often do) carry their entire artillery—often a single

pistol—with them at any one time."  *United States v. Hopkins*, 128 F. Supp. 2d 1, 7 (D.D.C.

2000).  The plaintiffs also allege, in response to the assertion in Wright's affidavit that

ammunition is often purchased in rounds of fifty, *see* Dkt. 1-1 at 5, that another MPD officer has

testified under oath in a different case that "there are often places where you can buy loose

bullets or individual bullets from other gun possessors," *id.* ¶ 44.

Accepting the plaintiffs' allegations as true, the Court must therefore consider how a

"hypothetical" affidavit might have read, omitting any deliberately false statements and inserting

any deliberately omitted information.  Thus recreated, Wright's affidavit would have averred that

he found a handgun in the pocket of a jacket found on the ground; that Boatwright was the only

one of the three men not wearing a jacket; that he later admitted that the gun and the jacket were

his, and he corroborated this admission by telling the officers the precise caliber of the firearm

and the exact number of bullets it was holding; that Crossland agreed to take the jacket from

Wright, but only after Wright insisted that he would break the Hennessy bottle on Crossland's

steps if none of the men took it; that, of the three men, only Crossland lived at the home the officers sought to search; that Wright and another officer had already searched the Crossland/Lane home for ten minutes and found no evidence of wrongdoing; that, even if there was reason to believe the gun may have belonged to Crossland, in the vast majority of cases where the MPD conducts searches following stops that uncover illegal guns, the searches are unsuccessful; and that there are often places to purchase "loose bullets or individual bullets," thus decreasing the likelihood that additional ammunition might be found in the house.

To pose the question whether such a hypothetical affidavit could possibly establish probable cause is to answer it. As amended, the affidavit fails to offer any colorable nexus between the handgun found in the pocket of Boatwright's jacket and the Crossland/Lane home. It establishes, at most, that an acquaintance of Crossland possessed a gun while sitting on the steps leading from the street to Crossland's home. It does not indicate that Boatwright was ever in the house, that Crossland was engaged in any unlawful conduct, or that people who are merely acquainted with people who illegally carry guns are likely to have evidence of that conduct in their homes. The hypothesized affidavit, accordingly, offers no "reasonable cause to believe that the specific 'things' to be searched for and seized [were] located on the property to which entry [wa]s sought." *Zurcher*, 436 U.S. at 556.

The Court must also consider what follows from this conclusion. According to the plaintiffs, the mere fact that Wright obtained "a warrant on the basis of knowing and recklessly false and misleading assertions" and omissions amounts to a violation of the Fourth Amendment. Compl. ¶¶ 87–88. That is not quite correct. The Fourth Amendment protects against unreasonable searches and seizures, not against unreasonable warrants. Thus, for example, the plaintiffs would have no cause of action if the MPD had never executed the warrant. For this

reason, the Court will construe the second count of the complaint as alleging that Wright harmed the plaintiffs by causing a search of their home through the acquisition of a search warrant that contained knowing or reckless misstatements and material omissions.  *See* Compl. ¶ 88.  The Supreme Court has held that such conduct violates the Fourth Amendment.  *See Franks*, 438 U.S. at 165.  The Court, accordingly, holds that Wright violated plaintiffs' clearly established rights by obtaining the warrant and thereby *causing the search to occur*, and he is not entitled to qualified immunity based on the facts as pled.

**D.      Execution of the Warrant**

In cases like this one, alleging that members of the police force violated the plaintiffs' Fourth Amendment rights by conducting a search (or causing a search to occur) pursuant to a defective warrant, the Court must apply the same standard that governs application of the Fourth Amendment exclusionary rule.  *See Malley v. Briggs*, 475 U.S. 335, 344 (1986).  That standard, announced in *Leon*, asks whether the officers' reliance on the warrant was "objectively reasonable."  468 U.S. 897, 922 (1984).  If it was, that ends the inquiry, and the police officers who caused or effectuated the search are immune from claims for damages.

In assessing objective reasonableness, the Court must consider all relevant facts and circumstances.  "[T]he fact that a neutral magistrate has issued a warrant," however, "is the clearest indication that the officer acted in an objectively reasonable manner."  *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012).  An executing officer in that case would know that a neutral judicial officer, who is responsible for reviewing warrant applications, had determined that the application establishes probable cause, and at least "[i]n the ordinary case, [such] an officer cannot be expected to question" that determination.  *Leon*, 468 U.S. at 921.  But "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional

search . . . does not end the inquiry into objective reasonableness." *Messerschmidt*, 132 S. Ct. at

1245. Even with a warrant in hand, it remains "incumbent on the officer executing [it] to ensure

the search is lawfully authorized," *Groh*, 540 U.S. at 563, and he or she remains subject to suit if

the warrant "is so lacking in indicia of probable cause as to render official belief in its existence

unreasonable," *Leon*, 468 U.S. at 923. This threshold for bringing suit for damages is an

admittedly "high one," *Messerschmidt*, 132 S. Ct. at 1245, but it is surmountable in the rare case

where "it is obvious that no reasonably competent officer would have concluded that a warrant

should issue," *Malley*, 475 U.S. at 341.

In considering the reasonableness of the MPD officers' reliance on the warrant in this

case, neither the plaintiffs nor the defendants draw a clear distinction between Wright, who

prepared and filed the allegedly misleading affidavit, and the other officers. Because not all of

the defendants are necessarily similarly situated, the Court will first address the plaintiffs' claim

against Wright and will then turn to the other officers.

      1.    *Officer Wright*

Wright prepared and submitted the allegedly false and misleading application for a search

warrant. *See* Dkt. 1-1. That allegation places him in a fundamentally different posture than the

officers who merely executed the warrant. To the extent that Wright "prepared the invalid

warrant" application, he has no basis to "argue that he reasonably relied on the" issuing judge's

"assurance that the warrant contained an adequate description of the things to be seized and was

therefore valid." *Groh*, 540 U.S. at 564. The Court, accordingly, denies the defendants' motion

to dismiss Count One as against Wright. *See, e.g.*, *Pitts*, 2016 WL 1301046, at *11.

      2.    *Remaining Officers*

The question whether the remaining officers were entitled to rely on the warrant is considerably more difficult.  As an initial matter, the Court notes that not all officers in this second group are necessarily similarly situated.  Some may have had reason to know that some or all of the assertions contained in Wright's affidavit were false, while others may have been in the dark.  But the plaintiffs have made no effort to distinguish among the officers, and they have not alleged that any officers—other than Wright—who executed the warrant had reason to know that Wright's averments were false.  The Court must therefore dismiss Count One against the remaining officers unless it was "obvious" from the face of Wright's affidavit "that no reasonably competent officer would have concluded that a warrant should issue."[10]  *Malley*, 475 U.S. at 341; *see also Winder v. Erste*, 905 F. Supp. 2d 19, 28 (D.D.C. 2012) (explaining that once qualified immunity is asserted, the plaintiff has the burden of showing that the official is not entitled to qualified immunity),

Even under this permissive standard, the plaintiffs make a substantial argument that no reasonable officer could have believed that the Wright affidavit was sufficient to establish probable cause to search the Crossland/Lane home.  As the D.C. Circuit has recognized, illegal activity outside a home may, at times, support a finding of probable cause to search the home. *See Thomas,* 989 F.2d at 1254; *see also Washington*, 775 F.3d at 409; *Spencer*, 530 F.3d at 1007;

---

[10]  The complaint alleges that Haselden and a third, unnamed officer were present when Wright spoke with Crossland about the jacket and when Wright conducted a warrantless search of the Crossland/Lane home, *see* Compl. ¶¶ 49–51, 55–57, raising the possibility that they may have been aware that the affidavit mischaracterized Crossland's statement regarding the jacket and omitted the fact that the officers had already performed a ten-minute warrantless search of the home.  But although the complaint includes a generic allegation that all of the officers "participated in the planning and execution of the home search, . . . the unlawful stop, search, and seizure of Mr. Crossland, the unlawful seizure of Ms. Lane, the unlawful seizure of Ms. Crossland and [her] property, and the unlawful warrantless home search," Compl. ¶ 15, it does not specify whether Haselden or the unnamed officer was personally involved in executing the warrant or whether they were aware of any other falsehoods or omissions in the affidavit.

*United States v. Johnson*, 437 F.3d at 72.  The essential requirement for making such a showing,
however, is establishing a reasonable nexus between the illegal conduct and the home.  *See
Zurcher*, 436 U.S. at 556.  For this reason, "residential searches have been upheld only where
some information links the criminal activity to the defendant's residence."  *Hopkins*, 128 F.
Supp. 2d at 5 (internal quotation marks omitted).

Here, the link between the illegal conduct (Boatwright's possession of the firearm) and
the Crossland/Lane home is decidedly weak.  Even accepting the facts as Wright recounted them
in his affidavit, there were good reasons to doubt that the red jacket (and hence the gun)
belonged to Crossland.  To be sure, Wright avers that Crossland said that the jacket was his when
Wright threatened to keep the bottle of Hennessy if none of the men claimed the jacket.  Dkt. 1-1
at 3.  But the affidavit also states that the jacket was on the ground next to where Boatwright sat,
that Boatwright was the only one of the three men without a jacket, and that, even after
Crossland said the jacket was his, Wright concluded that the jacket was "abandoned."  *Id.* at 2–3.
The affidavit further states that it was Boatwright who "neglect[ed] to pick up the red jacket"
when the men moved to the porch.  *Id.* at 3.  Even more significantly, the affidavit asserts that
Boatwright admitted—against his interest—that the gun was his, and he was able to corroborate
that admission by confirming the caliber of the gun and how many bullets were in it.  *Id.* at 4.
Thus, reading the affidavit, a reasonable officer would conclude that, although there was *some*
minimal evidence that the jacket and gun belonged to Crossland, it was far more likely that both
belonged exclusively to Boatwright.

To the extent the gun belonged to Boatwright, the affidavit contains no colorable basis
for believing that evidence of Boatwright's crime might be found in the Crossland/Lane home.
Wright invokes his purported "training" and "experience" to establish that "persons involved in

illegal activities maintain books, records, documentation and other papers relating to their ordering, sales and servicing of their firearms" in a place where that person "can obtain and access them." Dkt. 1-1 at 5. He further states that "people keep their firearms and ammunition in *their* homes." *Id.* (emphasis added). But the affidavit contains no averment even suggesting that *Boatwright*, who lived elsewhere, would have been able to "obtain and access" records and materials relating to his handgun in *Crossland*'s house. Certainly, no reasonable officer would have believed that the unadorned fact that Boatwright was sitting with Crossland on Crossland's front steps established probable cause to search Crossland's house for evidence of Boatwright's criminal activity.

That, then, leaves the possibility that the affidavit might be read to say that both Crossland and Boatwright claimed ownership of the jacket that contained the handgun and that a search of Crossland's home was warranted to determine, in essence, which of two confessions of guilt to accept. Read in this fashion, Wright's invocation of his "training" and "experience" is at least comprehensible, although it might still raise questions in the mind of a reasonable officer. For one thing, he relied on his "training, experience and participation in *narcotics* and *drug* related investigations," Dkt. 1-1 at 5 (emphasis added), to support his conclusions, but there was no evidence that would have led a reasonable officer to believe that Crossland (or Boatwright) was engaged in illegal narcotics activity. And as discussed above, it is far from clear that the type of "commonsense" inference that the D.C. Circuit has recognized in drug cases applies in gun cases, where there is not the same need to maintain "a place to store . . . inventory." *Hopkins*, 128 F. Supp.2d at 7; *see supra* p. 34.

The Court concludes that the Wright affidavit would not establish probable cause to search the Crossland/Lane home, even if read in this generous fashion; it would at most establish

that there was *some* possibility (albeit remote) that the gun belonged to Crossland and that, if it was his, there might have been some evidence of that fact in the home.  That, however, does not end the inquiry.  Rather, absent cause to doubt the veracity of the affidavit or the neutrality of the magistrate, the relevant question is whether the warrant's shortcomings were so "obvious that no reasonably competent officer would have concluded" that the affidavit supported issuance of the warrant.  *Malley,* 475 U.S. at 341.  That assessment, moreover, must be made through the lens of an officer who knows that a neutral, judicial officer, trained in the relevant law has reviewed the affidavit and found that it was sufficient.  As the Supreme Court explained in *Messerschmidt,* while "a [judicial officer's] approval" of a warrant application "does not automatically render an officer's conduct reasonable[,] . . . [t]he fact that the officers secured . . . approval[] is certainly pertinent in assessing whether they could have held a reasonable belief that the warrant was supported by probable cause."  132 S. Ct. at 1249–50.  Despite the significant deficiencies in the warrant, the Court nonetheless concludes that it "was not so obviously lacking in probable cause that the officers can be considered 'plainly incompetent' for concluding otherwise."  *Id.* at 1250 (quoting *Malley*, 475 U.S. at 341).  As construed above, the showing of probable cause was weak principally because it was unlikely that the gun belonged to Crossland.  But there was at least *some* possibility that it did—the warrant said that Crossland asked Wright to hand him the jacket, and that jacket held a gun.  *See* Dkt. 1-1 at 3.  Assessing the quantum of evidence necessary to justify a search is the type of judgment where a reasonable officer is most likely to defer to the neutral, judicial officer's determination that sufficient evidence was presented.  That is not to say that the existence of a warrant "automatically" absolves the executing officer of responsibility to ensure that there is probable cause but only that the judicial imprimatur is a relevant consideration, particularly where the existence of probable cause turns on the inherently

imprecise assessment of how probable is probable enough. *Messerschmidt*, 132 S. Ct. at 1249–50.

The Court will, accordingly, dismiss Count One of the complaint against all of the individual officers other than Wright. To the extent the plaintiffs have a good-faith basis to allege that other officers were aware of the falsehoods and omissions allegedly included in the affidavit, they may seek leave to amend to pursue those other officers as well.

**E.     Policy, Pattern, and Custom of the MPD**

Finally, Count Four of the complaint seeks to hold the District of Columbia liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), for its "pattern, policy, and practice of training its officers to include in search warrant applications statements of 'training' and 'experience' that are unsubstantiated, vague, self-defeating, contradictory, woefully insufficient[,] . . . incomplete, and materially false and recklessly misleading." Compl. ¶ 92. The Court must conduct a two-step inquiry when evaluating a claim for municipal liability. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992)). "First, the court must determine whether the complaint states a claim for a predicate constitutional violation. Second . . . [it] must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation." *Id.* (citing *Collins*, 503 U.S. at 120). Here, the District's sole argument for dismissing the plaintiffs' claim for municipal liability is that they have not established a "predicate constitutional violation." Dkt. 9 at 15. In concluding that the plaintiffs have alleged a sufficient basis to proceed against Wright, the Court has already concluded otherwise. The District makes no argument as to the second prong of *Baker*, and, in any event, the complaint adequately alleges that the purportedly unconstitutional search of the

Lane/Crossland home was the result of the District's "pattern, policy, and practice" of an affiant

officer falsely claiming that his training and experience led him to believe that evidence of a

crime would be present.  Compl. ¶ 92.  The Court will therefore deny the District's motion to

dismiss count four of the complaint.  *See, e.g.*, *Pitts*, 2016 WL 1301046, at *9.

## CONCLUSION

For the reasons explained above, the defendants' motion to dismiss, Dkt. 9, is

**GRANTED** in part and **DENIED** in part.

/s/ Randolph D. Moss
 RANDOLPH D. MOSS
United States District Judge


Date:  September 30, 2016